Robert E. **GIBSON**, Plaintiff–Appellant,

v.

**THE FLORIDA BAR and Members of the Board of Governors,** Defendants–Appellees.

No. 89–3388.

United States Court of Appeals, Eleventh Circuit.

July 23, 1990.

Herbert R. Kraft, Tallahassee, Fla., for plaintiff-appellant.

Joseph W. Little, Gainesville, Fla., for amicus curiae Joseph W. Little.

Paul Hill, The Florida Bar, Barry Scott Richard, Roberts, Baggett, LaFace & Richard, Tallahassee, Fla., for the Florida Bar.

Before TJOFLAT, Chief Judge, ANDERSON and CLARK, Circuit Judges.

TJOFLAT, Chief Judge:

In this case, the plaintiff, a member of the Florida Bar, appeals the district court's dismissal of his suit challenging the Florida Bar's procedures for handling objections to the Florida Bar's use of compulsory bar dues to fund its political lobbying. The district court held that the procedures satisfied the constitutional requirements articulated by the Supreme Court in *Chicago Teachers Union, Local No. 1 v. Hudson*, 475 U.S. 292, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986). We affirm in part and reverse in part.

I.

On March 27, 1984, the plaintiff, Robert E. Gibson, filed a complaint against the Florida Bar and the members of its board of governors (the Bar) seeking a declaratory judgment and injunctive relief. Gibson claimed that the Bar was violating his first and fourteenth amendment rights[1] by using a portion of his compulsory dues to fund political lobbying. Specifically, Gibson challenged the Bar's use of compulsory dues to fund its campaign in opposition to a constitutional initiative known as "proposition one."[2] He also generally challenged

1. The first amendment, which the fourteenth amendment makes applicable to the States, *see Stromberg v. California*, 283 U.S. 359, 368, 51 S.Ct. 532, 535, 75 L.Ed. 1117 (1931), provides in pertinent part: "Congress shall make no law ... abridging the freedom of speech ...; or the right of the people peaceably to assemble...." U.S. Const. amend. 1. For convenience, we label Gibson's claim a first amendment claim.

2. Proposition one, modeled after California's proposition thirteen, proposed an amendment to the Florida Constitution that would limit the amount of revenue that the State could collect through taxes.

the Bar's use of compulsory dues to fund political lobbying. Gibson immediately moved for a preliminary injunction to prevent the Bar from further advocating its position against proposition one.

On that same day, the Florida Supreme Court issued an order removing proposition one from the general election ballot on the ground that it failed to comply with the single-subject requirement of Fla. Const. art. XI, § 3. *See Fine v. Firestone,* 448 So.2d 984 (Fla.1984). Accordingly, on March 28th, the district court denied Gibson's request for a preliminary injunction. The case then proceeded to trial, and in August 1985, the court issued a final judgment upholding the validity of the challenged activity and denying Gibson's request for a permanent injunction.

In its judgment, the court first held that the Florida Supreme Court's decision in *Fine* did not moot Gibson's suit because Gibson still challenged the Bar's general practice of funding political advocacy with compulsory bar dues. The court then held that under *Abood v. Detroit Board of Education,* 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1976), the Bar's general practice was constitutionally permissible. The court reasoned that "the State may intrude upon plaintiff's First Amendment rights

where the intrusion is justified by a sufficiently important state interest, and so long as the intrusion is 'closely drawn.'" In the court's view, the Bar's purposes as articulated in the Integration Rule of The Florida Bar[3] constituted a "sufficiently important state interest." Moreover, the Bar's policy on political advocacy was sufficient to ensure that the Bar's political positions[4] would be closely enough related to these important state interests.

Gibson appealed this judgment. In *Gibson v. Florida Bar,* 798 F.2d 1564 (11th Cir.1986) [hereinafter *Gibson I*], a panel of this court reversed the district court and remanded the case for further proceedings. After a review of Supreme Court cases on the constitutionality of compulsory membership dues and of the use of those dues to support political activities, *e.g., Lathrop v. Donohue,* 367 U.S. 820, 81 S.Ct. 1826, 6 L.Ed.2d 1191 (1961); *Railway Employees' Dep't v. Hanson,* 351 U.S. 225, 76 S.Ct. 714, 100 L.Ed. 1112 (1956); *International Machinists v. Street,* 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961); *Abood v. Detroit Bd. of Educ.,* 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977); *Ellis v. Railway Clerks,* 466 U.S. 435, 104 S.Ct. 1883, 80 L.Ed.2d 428 (1985),[5] the panel concluded

**3.** The Preamble to the Integration Rule provides, in pertinent part:

> To inculcate in its members the principles of duty and service to the public, to improve the administration of justice, and to advance the science of jurisprudence, the following principles are expressly adopted by the Court:
> (a) The Florida Bar, a body created by and existing under the authority of this Court, is charged with the maintenance of the highest standards and obligations of the profession of law....

**4.** Standing Board Policy 900 provided, in pertinent part:

> a) The purposes of The Florida Bar are set forth in the Integration Rule. Neither The Florida Bar nor any of its committees or sections may take a position on legislation either as a proponent or opponent unless it is determined by the Board of Governors that the legislation is related to the purposes of The Florida Bar as set forth in the Integration Rule.
> b) The Bylaws of The Florida Bar set forth the restrictions on establishing a legislative

policy. Article VI, Section 2 of the Bylaws provides that:

> No legislative matter shall be recommended, approved, disapproved or endorsed by The Florida Bar unless such action is initiated by a written report and recommendation of a committee and approved by a majority vote of the active members present at the [annual] meeting; or, legislative matters may be recommended, approved, disapproved, or endorsed on behalf of The Florida Bar at any time by two-thirds vote of the members of the Board of Governors present at the meeting, and during the time when the Legislature is in session the Executive Committee may act upon pending or proposed legislation.

**5.** The panel held that these cases, almost all of which involved unions rather than bar associations, also controlled in cases involving bar associations. *See Gibson I,* 798 F.2d at 1568–69. The Supreme Court has also expressly adopted this position in *Keller v. State Bar,* — U.S. —, —, 110 S.Ct. 2228, 2235–37, 110 L.Ed.2d 1 (1990). I discuss that case in more detail below. *See infra* note 12.

that the Bar's use of compulsory dues to support political activity would be constitutional if a "compelling interest" supported the Bar's activity and if the Bar had used the "least restrictive means" of achieving that interest. *Gibson I,* 798 F.2d at 1569. Applying this analysis, the panel held that the district court had not adequately evaluated whether "certain positions taken by the Bar were sufficiently related to its basic function to justify the expenditure of compulsory dues" and therefore remanded the case to the district court for further findings on this issue. *Id.*

At the conclusion of its opinion, the panel "stressed" that it had addressed "only the use of compelled fees by the Bar." As the panel noted,

> the union was free to politicize on *any* issue of interest to that group.... Only the use of compelled funds was prohibited for issues unrelated to collective bargaining.... Similarly, the Bar may speak as a group on any issue as long as it does so without using the compulsory dues of dissenting members.

*Id.* at 1570 (citations omitted). In a footnote, the panel further explained that

> the difficult task of discerning proper Bar position issues could be avoided by one of two methods: (1) a voluntary program in which lawyers would not be compelled to finance the Legislative Program, but could contribute towards that program as they wished; or (2) a refund procedure allowing dissenting lawyers to notify the Bar that they disagree with a Bar position, then receive that portion of their dues allotted to lobbying.

**6.** *See infra* at 629–30 (discussing *Chicago Teachers*).

**7.** The parties submitted no revised pleadings; rather, the amendment process took place through the parties' memoranda to the court and hearings before the court.

**8.** 2–9.3 Legislative Policies.

(a) The board of governors shall adopt and may repeal or amend rules of procedure governing the legislative activities of The Florida Bar in the same manner as provided in rule 2–9.2; provided, however, that the adoption of any legislative position shall require the affirmative vote of two-thirds of those present at any regular meeting of the board of gover-

*Id.* at 1570 n. 5. At the time of the panel's disposition, however, the Bar had no such program or procedure, and the panel therefore remanded the case to the district court for findings on the propriety of the Bar's political activity.

In November 1986, the Bar amended Standing Policy 900 to include a set of refund procedures. The Bar then moved the district court for a "judgment on the mandate" on the grounds that these procedures complied with the requirements announced in *Chicago Teachers Union, Local No. 1 v. Hudson,* 475 U.S. 292, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986).[6] The Bar's motion in effect requested leave of court to amend its answer to Gibson's complaint and to file a counterclaim. The amended answer would assert that the controversy described in Gibson's complaint was moot, and the counterclaim would request a declaration that the Bar's new procedures passed constitutional muster. The court implicitly gave the Bar leave to proceed in this fashion[7] and, in March 1987, issued an order holding the case in abeyance for seventy days to allow for possible action by the Florida Supreme Court on the Bar's amendments to Standing Policy 900. The Bar subsequently undertook to amend its bylaws—a process requiring approval by the Florida Supreme Court—in order to incorporate the new procedure. The district court therefore extended the abeyance until the Florida Supreme Court acted. On June 2, 1988, the Florida Supreme Court issued an opinion approving rule 2–9.3, the amended bylaw.[8] *See Florida Bar Re Amendment to Rule 2–9.3 (Legislative*

nors or two-thirds of the executive committee or by the president, as provided in the rules of procedure governing legislative activities.

(b) Publication of legislative positions. The Florida Bar shall publish notice of adoption of legislative positions in The Florida Bar News, in the issue immediately following the board meeting at which the positions were adopted.

(c) Objections to legislative positions of The Florida Bar. Any active member of The Florida Bar may, within forty-five (45) days of the date of publication of notice of adoption of a legislative position, file with the executive director a written objection to a particular position on a legislative issue. Failure to object within this time period shall constitute a waiv-

*Policies),* 526 So.2d 688 (Fla.1988). In April 1989, Gibson moved the district court to enjoin the application of the rule. After a hearing on the motion, the district court issued a final order in the case. Holding that rule 2–9.3 "meets the safeguards and requirements necessary for protection of members' first amendment rights, as set out in both the case of *Chicago Teachers Union v. Hudson* ... and ... *Gibson [I]*," the district court denied Gibson's request for injunctive relief and dismissed the case. Gibson appeals, challenging the constitutionality of rule 2–9.3.

## II.

### A. *The Bar's Procedures.*

As amended, rule 2–9.3 allows the Bar to adopt legislative positions pursuant to the procedures governing legislative activities in the Standing Board Policy 900, *see supra* note 4. If the Bar adopts a legislative position, the rule requires it to publish a notice of adoption in the next issue of The Florida Bar News, which is published twice monthly and mailed to all Bar members.[9] The rule also provides a procedure for handling objections to the Bar's legislative positions. Within forty-five days of publication of the notice of adoption, any member of the Bar may "file with the executive director a written objection to a particular position on a legislative issue." Rule 2–9.-3(c). If a member fails to object within that time period, he waives his right to object. Once the director receives the objection, he must determine the pro rata amount of the member's dues that is being

er of any right to object to the particular legislative issue.

(1) After a written objection has been received, the executive director shall promptly determine the pro rata amount of the objecting member's dues at issue and such amount shall be placed in escrow pending determination of the merits of the objection. The escrow figure shall be independently verified by a certified public accountant.

(2) Upon the deadline for receipt of written objections, the board of governors shall have forty-five (45) days in which to decide whether to give a pro rata refund to the objecting member(s) or to refer the action to arbitration.

(d) Composition of arbitration panel. Objections to legislative positions of The Florida Bar may be referred by the board of governors to an arbitration panel comprised of three (3) members of The Florida Bar, to be constituted as soon as practicable following the decision by the board of governors that a matter shall be referred to arbitration.

The objecting member(s) shall be allowed to choose one member of the arbitration panel, The Florida Bar shall appoint the second panel member, and those two (2) members shall choose a third member of the panel who shall serve as chairman. In the event the two (2) members of the panel are unable to agree on a third member, the chief judge of the Second Judicial Circuit of Florida shall appoint the third member of the panel.

(e) Procedures for arbitration panel. Upon a decision by the board of governors that the matter shall be referred to arbitration, The Florida Bar shall promptly prepare a written response to the objection and serve a copy on the objecting member(s). Such response and objection shall be forwarded to the arbitration panel as soon as the panel is properly consti-

tuted. The arbitration panel shall thereafter confer and decide whether the legislative matters at issue are constitutionally appropriate for funding from mandatory Florida Bar dues.

(1) The scope of the arbitration panel's review shall be to determine solely whether the legislative matters at issue are within those acceptable activities for which compulsory dues may be used under applicable constitutional law.

(2) The proceedings of the arbitration panel shall be informal in nature and shall not be bound by the rules of evidence. The decision of the arbitration panel shall be binding as to the objecting member(s) and The Florida Bar. If the arbitration panel concludes the legislative matters at issue are appropriately funded from mandatory dues, there shall be no refund and The Florida Bar shall be free to expend the objecting member's pro rata amount of dues held in escrow. If the arbitration panel determines the legislative matters at issue are inappropriately funded from mandatory dues, the panel shall order a refund of the pro rata amount of dues to the objecting member(s).

(3) The arbitration panel shall thereafter render a final written report to the objecting member(s) and the board of governors within forty-five (45) days of its constitution.

(4) In the event the arbitration panel orders a refund, The Florida Bar shall provide such refund within thirty (30) days of the date of the arbitration panel's report, together with interest calculated at the legal rate of interest as of the date the written objection was received by The Florida Bar.

9. We take judicial notice of these facts, thereby granting a motion by the Bar that was carried with the case.

used to fund the Bar's political activity and must place that amount in escrow pending determination of the objection's merits. The rule gives the Bar forty-five days either to refund the member's pro rata share [10] or to refer the matter to arbitration.

If the Bar chooses to refer the matter to arbitration, it must prepare a written response to the member's objection, serve a copy of the response on the member, and forward a copy to the arbitration panel. The arbitration panel consists of three individuals, one chosen by the objecting member, another chosen by the Bar, and the third chosen by the first two individuals. The panel decides whether the political activity at issue can constitutionally be funded from compulsory bar dues, and its decision is binding on both the objecting member and the Bar. If the panel orders the Bar to refund the member, then within thirty days, the Bar must refund the member's pro rata share with interest, which is calculated at the legal rate from the date the Bar received the member's written objection. *See supra* note 9; *infra* at 628.

### B. *Gibson's Contentions.*

Gibson challenges these procedures on several grounds. His primary contention is that the Supreme Court cases in this area require an advance deduction rather than a refund. He also contends that the Bar's scheme unconstitutionally requires the dissenter to object on an issue-by-issue basis, thus unconstitutionally forcing the dissenter to identify his own position, and that the arbitration panel is impermissibly composed of other Bar members who necessarily have a monetary interest in the dispute.

Gibson further claims that even if the refund scheme is permissible, the Bar improperly calculates interest only as of the date the Bar receives the member's written objection.[11] After reviewing the Supreme Court's pronouncements in *Chicago Teachers*, we address these contentions in turn.

### C. *Analysis.*

In *Chicago Teachers Union, Local No. 1 v. Hudson,* 475 U.S. 292, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986), the Supreme Court considered whether the grievance procedure established by a teachers union to process objections by non-union members concerning the use of their dues was constitutionally sufficient. The union in that case acted as the exclusive collective-bargaining representative of approximately ninety-seven percent of Chicago's public school teachers. Nonmembers received the benefits of union representation without paying dues. In 1982, the union entered into an agreement with the Chicago Board of Education, whereby the Board would deduct "proportionate share payments" from nonmembers' salaries.

The union also established procedures for handling nonmembers' objections about the deductions. Pursuant to these procedures, once the deduction had been made, the nonmember could object within thirty days in writing to the union president. If both the union's executive committee and its executive board decided against the objector, then the union president would select a single arbitrator from a list maintained by the Illinois Board of Education. If the arbitrator ruled in favor of the objector, then the union would give the objector

---

**10.** The rule does not state whether this refund includes interest. The Bar, however, has indicated throughout this case that its refund procedures do include interest. Presumably, the Bar calculates interest on refunds paid within forty-five days after receipt of the written objection just as it calculates interest on refunds paid pursuant to an arbitration panel's order: "at the legal rate of interest as of the date the written objection was received by The Florida Bar." Rule 2–9.3(e)(4). We discuss the sufficiency of this provision below. *See infra* notes 13–14 & accompanying text.

**11.** Gibson also requests an award of retroactive damages in the form of a refund for the proportion of his compulsory dues that the Bar has used to fund its political lobbying in the past. Gibson, however, now makes this request for the first time. He made no request for a refund or for monetary damages in his complaint; nor did he present any evidence on this issue at trial or on remand. We, therefore, do not reach this question.

a rebate and reduce the amount of future deductions for all nonmembers.

When the first paycheck deduction was taken in 1982, several nonmembers objected, contending that the union was using a proportion of their dues for activity unrelated to collective bargaining. The union sent brief responses to the nonmembers, explaining how the proportionate deduction had been calculated and describing the objection procedures. The objecting nonmembers then brought suit in federal court challenging the objection procedures.

The Supreme Court began its evaluation of the procedures with a review of *Abood v. Detroit Board of Education*, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977). As the Court stated, *Abood* stands for the proposition that, although a public employer may constitutionally designate a union to be an exclusive collective bargaining representative and require its nonmember employees to pay a fair share of the costs relating to the union's collective-bargaining, the nonmembers cannot constitutionally be required to support political activity by the union that is unrelated to the union's collective-bargaining duties. *Chicago Teachers*, 475 U.S. at 301–02, 106 S.Ct. at 1073 (citing *Abood*, 431 U.S. at 234, 97 S.Ct. at 1799). Thus, "[t]he objective" of the procedures for handling objections "must be to devise a way of preventing compulsory subsidization of ideological activity by employees who object thereto without restricting the Union's ability to require every employee to contribute to the cost of collective-bargaining activities." *Id.* at 302, 106 S.Ct. at 1074 (quoting *Abood*, 431 U.S. at 237, 97 S.Ct. at 1800).

Applying this standard, the Court determined that the union's procedure was defective in three respects. First, the possibility of a rebate did not adequately ensure against the risk that the objectors' funds would be used even temporarily for an improper purpose. *Id.* at 305, 106 S.Ct. at 1075. Second, the union's advance reduction of nonmembers' dues was inadequate because the union failed to provide information on how the proportionate share had been determined. *Id.* at 306, 106 S.Ct. at 1075. Third, because the union "entirely controlled" the arbitration procedure "from start to finish," the procedure did not provide for a "reasonably prompt decision by an impartial decisionmaker." *Id.* at 308, 307, 106 S.Ct. at 1076–77, 1076.

The Court also considered whether a 100% escrow of the nonmembers' dues would eliminate the procedure's defects. The court held that the escrow would eliminate the procedure's first flaw—the risk that nonmembers' contributions would be temporarily used for impermissible purposes. Indeed, the court expressly stated that a 100% escrow was not necessary; an escrow of the proportion at issue would be sufficient. Even a 100% escrow, however, did not eliminate the procedure's second and third defects. *Id.* at 309–10, 106 S.Ct. 1077–78. The Court therefore held the procedure unconstitutional, concluding as follows:

> We hold today that the constitutional requirements for the Union's collection of agency fees include an adequate explanation of the basis for the fee, a reasonably prompt opportunity to challenge the amount of the fee before an impartial decisionmaker, and an escrow for the amounts reasonably in dispute while such challenges are pending.

*Id.* at 310, 106 S.Ct. at 1078.

We apply the *Chicago Teachers* holding to the present case in order to determine whether, in light of Gibson's challenge, the objection procedures established by the Bar in rule 2–9.3 accomplish the required "objective . . . of preventing compulsory subsidization of ideological activity by [Bar members] who object thereto without restricting the [Bar's] ability to require every [member] to contribute to the cost of [permissible] activities." *Id.* at 302, 106 S.Ct. at 1074 (quoting *Abood*, 431 U.S. at 237, 97 S.Ct. at 1800).[12] We consider Gibson's contentions in turn.

---

**12.** This application of *Chicago Teachers* is consistent with the Supreme Court's recent decision in *Keller v. State Bar,* —— U.S. ——, 110 S.Ct. 2228, 110 L.Ed.2d 1 (1990). In *Keller,* members

### 1.

■ Gibson first argues that the Supreme Court cases require the Bar to provide an advance deduction for the proportion of dues that the Bar knows will be used for political activity. In response, the Bar contends that the cases clearly approve an interest-bearing escrow account as an alternative. In addition, the Bar claims that an advance deduction would not be feasible. It argues that when Bar dues are assessed on July 1, the Bar does not yet know what political activity it will undertake in the coming year. Moreover, it does not spend a fixed amount on political activity from year to year.

We reject Gibson's reading of the case-law on this point. In *Ellis v. Railway Clerks*, 466 U.S. 435, 443–44, 104 S.Ct. 1883, 1889–90, 80 L.Ed.2d 428 (1984), the Supreme Court invalidated a "pure rebate approach" but noted the existence of "readily available alternatives, such as advance reduction of dues *and/or interest-bearing escrow accounts.*" (Emphasis added.) The Court restated this proposi-

tion in *Chicago Teachers*, 475 U.S. at 303–04, 106 S.Ct. at 1074 (quoting *Ellis* ), and stated that "an escrow for the amounts reasonably in dispute," along with an adequate explanation of the fee and an opportunity to challenge the amount, would satisfy the constitutional requirements for an objection procedure, *id.* at 310, 106 S.Ct. at 1078. These statements provide indisputable authority that an interest-bearing escrow account (along with an otherwise satisfactory procedure) is sufficient. Gibson would have us believe that these statements are merely dicta and thus not controlling. He suggests that every objection procedure approved by the Supreme Court has involved an advance deduction. In light of the Court's express approval of a proportionate escrow in *Chicago Teachers*, we reject Gibson's argument.

■ Gibson also challenges rule 2–9.-3(e)(4), which provides for the calculation of interest on refunds after arbitration only "as of the date the written objection was received." [13] We hold that this formula for

of the California State Bar challenged the Bar's use of mandatory dues to finance political activities. The Supreme Court applied the rule in *Abood* that unions, and by implication bar associations, cannot fund political activities from the mandatory dues of employees or bar members who *object* to such expenditures. *See id.* at ——, 110 S.Ct. at 2233–35. Of course, as the Court noted in *Keller,* political activities can still be funded from mandatory dues of *non-objecting* employees or bar members. *See id.* The Court pointed to *Chicago Teachers* as the case in which the Court "outlined a minimum set of procedures by which a union … could meet its requirement under *Abood*," *id.* at ——, 110 S.Ct. at 2237, that is, by which the union or bar could ensure that objecting members' dues were not used to finance the political activity at issue.

Unlike the Florida Bar in the present case, however, the California Bar provided no procedures for handling bar members' objections to such expenditures. The Court in *Keller* thus addressed the California Bar's broader argument that *Abood* did not apply to its use of compulsory dues to finance political activities because the Bar was a state agency and therefore could use the dues for any purpose within its broad statutory authority. *See id.* —— U.S. at ——, 110 S.Ct. at 2228. The Supreme Court rejected this argument and held that the Bar was subject "to the same constitutional rule [under *Abood* ] with respect to the use of compulsory dues as are labor unions representing public

and private employees." *Id.* at ——, 110 S.Ct. at 2235. The Court then suggested what kinds of expenditures, at "the extreme end[ ] of the spectrum," *id.,* would implicate that rule and remanded the case for further proceedings consistent with the opinion.

The Court in *Keller* thus reaffirmed the holdings of *Abood* and *Chicago Teachers* and expressly applied those holdings to state bar associations as well. Because the case before it lacked a developed record regarding possible procedures to satisfy this requirement, however, the Court declined to conduct any analysis of what procedures would satisfy the mandate of *Chicago Teachers* under the circumstances in *Keller. See id.* at ——, 110 S.Ct. at 2237–38. The present case, in contrast, involves exactly such an issue concerning the Florida Bar's objection procedures. We therefore undertake to analyze those procedures under *Chicago Teachers*—an undertaking that is entirely consistent with the Supreme Court's recent pronouncements in *Keller.*

**13.** As we note above, *supra* note 10, rule 2–9.3 does not specify whether refunds issued without arbitration (within forty-five days after the Bar receives a written objection, pursuant to section (c)(2)) include interest. At oral argument, the Bar asserted that its refund procedures included interest payments. Based on this representation, we assume that refunds pursuant to section (c)(2) include interest, which is calculated

calculating interest is not sufficient to "avoid the risk that [the objecting members'] funds will be used, even temporarily, to finance ideological activities," *Abood*, 431 U.S. at 244, 97 S.Ct. at 1804 (Stevens, J., concurring). By calculating interest only "as of the date the written objection was received," the Bar can use the interest generated by the members' dues from the time of payment in July until the time of the objection. As the Bar has argued, it may not begin its lobbying until later in the year. Even if a member objects promptly after receiving notice of the Bar's position in the Florida Bar News, the Bar can still make use of the interest generated from the member's proportionate share until that time. We therefore find Gibson's attack on this point to be persuasive.[14] In order to protect against the danger that the objecting members' funds will be used in this way to finance the Bar's political activity, the Bar would have to calculate interest as of the date that payment of the members' bar dues was received.

## 2.

■ Gibson next contends that the Bar's procedures impermissibly require dissenting members to object on an issue-by-issue basis, thus forcing them to identify their own political positions. The Bar responds that members need only make a generalized objection that a given issue is not closely enough related to the Bar's purposes to justify an expenditure of compulsory dues. The Bar claims that such an objection does not impermissibly require objectors to disclose their own position regarding the issue. We agree.

As the Supreme Court has stated, the dissenter "has the burden of raising an objection." *Chicago Teachers*, 475 U.S. at 306, 106 S.Ct. at 1075 (citing *Abood*, 431 U.S. at 239–40 & n. 40, 97 S.Ct. at 1801–02 & n. 40). This burden "is simply the obligation to make his objection known." *Id.* at 306 n. 16, 106 S.Ct. at 1075 n. 16. The affirmative objection requirement here is

within the scope of this obligation. It merely requires the objector to inform the Bar that he objects to the Bar's use of compulsory dues to support a given legislative policy. Beyond that, the objector need not provide any further information concerning the motivation for his objection or his own position concerning the legislative policy at issue. We therefore reject Gibson's challenge on this point.

## 3.

■ Finally, Gibson challenges the composition of the arbitration panel under rule 2–9.3. He claims that the panel is impermissibly composed of Bar members, who necessarily have an interest in the arbitration's outcome. The Bar responds that an arbitrator's mere membership in the Bar is insufficient to taint the arbitration proceeding. We agree with the Bar.

In *Chicago Teachers* the Court held that the arbitration procedure was objectionable because it was "from start to finish ... entirely controlled by the union." 475 U.S. at 308, 106 S.Ct. at 1076–77. Under the procedures in that case, the union itself selected a single arbitrator. The procedures here are clearly distinguishable. Rule 2–9.3 provides for a tripartite arbitration panel, and although the Bar picks one panel member, the objector picks another, and the third is chosen by the first two members of the panel. Thus, the Bar has nowhere near the degree of control over the arbitration process that the union had in *Chicago Teachers*. Given the nature of arbitration panels in this case—composed of arbitrators representing the competing parties' interests—whatever interest the arbitrators might have in the outcome as members of the Bar has no significance whatsoever. We therefore reject Gibson's challenge on this basis as well.

## III.

For the foregoing reasons, we hold that the Bar's procedures for handling objec-

---

in the same fashion as interest on refunds pursuant to section (e)(4).

**14.** Our holding applies as well to the calculation of interest on refunds issued pursuant to section (c)(2).

tions to its political lobbying are sufficient except for the formula for calculating interest on refund payments. The district court's decision is therefore AFFIRMED in part and REVERSED in part.

IT IS SO ORDERED.

CLARK, Circuit Judge, dissenting:

I dissent. I agree with appellant Gibson. His position is stated by the majority (at 629): "[Gibson's] primary contention is that the Supreme Court cases in this area require an advance deduction rather than a refund." In affirming the district court on this point, the majority fails to follow the precedent of *Gibson I*[1], which held:

> The *Abood* court concluded that a union may not spend compelled fees for the advancement of political views or ideological causes that are not incidental to the union's role as bargaining unit.... Stated another way, "*Abood* held that employees may not be compelled to support a union's ideological activities unrelated to collective bargaining. The basis for the holding that associational rights were infringed was the compulsory collection of dues from dissenting employees."

\* \* \* \* \* \*

The similarities between union dues and integrated bar dues are so substantial that we may safely transpose the *Abood* holding to the facts presented in this appeal as follows: the Florida Bar may use compulsory Bar dues to finance its Legislative Program *only* to the extent that it assumes a political or ideological position on matters *that are germane to the Bar's stated purposes*. (Emphasis added.)

\* \* \* \* \* \*

The proper focus in this action should be upon the actual results of the Bar's Legislative Program, *i.e.*, whether past positions of the Bar were sufficiently related

to its purpose of improving the administration of justice. On this issue, *the Bar bears the burden of proving that its expenditures were constitutionally justified.* (Emphasis added.)

*Gibson I,* 798 F.2d at 1567–69 (citations omitted). There is no dispute about the fact that the Bar has never established that "its expenditures were constitutionally justified."

The majority simply misreads *Chicago Teachers Union v. Hudson.*[2] The panel says, "The union also established procedures for handling nonmembers' objections about the deductions." (at 629). The panel compares the procedure there to the procedure in the Florida Bar rule. The panel overlooks that the nonmembers in *Chicago Teachers* were only paying 95% of the union dues as a consequence of the union making advance deductions for activities not germane to pure union objectives. As described in *Chicago Teachers,* 475 U.S. at 295, 106 S.Ct. at 1070, the union identified expenditures unrelated to collective bargaining and contract administration for the past year and found them to be approximately 5%.

The union in *Chicago Teachers* did exactly what appellant Gibson is asking our court to require the Bar to do in this case. It deducted in advance that portion of the dues allocable to those expenditures it acknowledged to be unrelated to collective bargaining and contract administration. The union then went on to establish a procedure where nonmembers could object to expenditures by the union of payments from any part of the 95% used toward legislative and political activities which were nevertheless still anathema to those nonmembers. The panel adopts this latter procedure without requiring the Bar to deduct in advance that part of Gibson's dues which can be approximated from experience to be allocable to non-administration of justice lobbying activities.[3]

1. *Gibson v. The Florida Bar,* 798 F.2d 1564 (11th Cir.1986).

2. 475 U.S. 292, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986).

3. The majority accepts the Bar's argument "that advance deductions would not be feasible" because the Bar claims it "does not yet know what political activity it will undertake in the coming year." This is rebutted in the Court's recent

Such "non-administration of justice" lobbying was identified in note 1 of *Gibson I* as positions that had been taken by the Florida Bar in the past: "(1) opposed tort reform; (2) opposed limitation of damages in medical malpractice actions; (3) opposed changes in the state sales tax; (4) opposed changes in the state's taxation and venue powers; and (5) advocated regulation of child care centers." *Id.* at 1565 n. 1.

The panel in note 4 of *Gibson I* identified as acceptable areas for Bar lobbying to be: "(1) questions concerning the regulation of attorneys; (2) budget appropriations for the judiciary and legal aid; (3) proposed changes in litigation procedures; (4) regulation of attorneys' client trust accounts; and (5) law school and Bar admission standards." *Id.* at 1569 n. 4. It is the law of the case that the Bar has in the past expended members' dues for lobbying activities unrelated to the administration of justice. Gibson won his case before the first panel and loses here by not being afforded a remedy. He is entitled to the same relief allowed to the plaintiffs in *Abood, Chicago Teachers,* and *Ellis.*

In *Chicago Teachers,* the Supreme Court opens with this quotation:

In *Abood v. Detroit Board of Education,* 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977), "we found no constitutional barrier to an agency shop agreement between a municipality and a teacher's union insofar as the agreement required every employee in the unit to pay a service fee to defray the costs of collective bargaining, contract administration, and grievance adjustment. The union, however, could not, consistently with the Constitution, *collect from dissenting employees any sums for the support of ideological causes not germane to its duties* as collective-bargaining agent." *Ellis v. Railway Clerks,* 466 U.S. 435, 447, 104 S.Ct. 1883, 1892, 80 L.Ed.2d 428 (1984). (Emphasis added.)

475 U.S. at 294, 106 S.Ct. at 1069, 89 L.Ed.2d at 239. By permitting the Florida Bar to *collect* dues from the dissenter Gibson and then requiring him to notify the Bar of those individual lobbying activities to which he objects,[4] the majority pays little or no attention to Supreme Court authority and our prior panel opinion.

The majority also misapplies *Ellis v. Railway Clerks,* 466 U.S. 435, 104 S.Ct. 1883, 80 L.Ed.2d 428 (1984). The majority quotes the Supreme Court as invalidating a "pure rebate approach" but noted the existence of "readily available alternatives, such as advance reduction of dues *and/or inter-*

---

opinion in *Keller v. State Bar of California,* —— U.S. ——, 110 S.Ct. 2228, 110 L.Ed.2d 1 (1990). The Court specifically states it is in agreement with Justice Kaufman's dissent in the California Supreme Court case where he said:

Since the bar already is statutorily required to submit detailed budgets to the Legislature prior to obtaining approval for setting members' annual dues (Bus. and Prof.Code § 6140.1), the argument that the constitutionally mandated procedures would create 'an extraordinary burden' for the bar is unpersuasive. 'While such a procedure would likely result in some additional administrative burden to the bar and perhaps prove at times to be somewhat inconvenient, such additional burden or inconvenience is hardly sufficient to justify contravention of the constitutional mandate. It is noteworthy that unions representing government employees have developed, *and have operated successfully within the parameters of Abood procedures for over a decade.'* [47 Cal.3d 1152, 255 Cal.Rptr. 542, 568] 767 P.2d 1020, 1046. (Emphasis added.)

**4.** The majority rejects Gibson's First Amendment claim that he should not be required to identify on an issue-by-issue basis those political positions to which he objects. Again the majority ignores *Abood* which holds:

But in holding that as a prerequisite to any relief each appellant must indicate to the Union the *specific* expenditures to which he objects, the Court of Appeals ignored the clear holding of [*Railway Clerks v.*] *Allen* [373 U.S. 113, 83 S.Ct. 1158, 10 L.Ed.2d 235 (1963) ]. As in *Allen,* the employees here indicated in their pleadings that they opposed ideological expenditures of *any* sort that are unrelated to collective bargaining. To require greater specificity would confront an individual employee with the dilemma of relinquishing either his right to withhold his support of ideological causes to which he objects or his freedom to maintain his own beliefs without public disclosure. It would also place on each employee the considerable burden of monitoring all of the numerous and shifting expenditures made by the Union that are unrelated to its duties as exclusive bargaining representative.

97 S.Ct. at 1802–03 (emphasis in original; footnote omitted).

est-bearing escrow accounts." (at 631). But the Court went on to say, "Given the existence of acceptable alternatives, the union cannot be allowed to commit dissenters' funds to improper uses even temporarily." *Ellis*, 466 U.S. at 444, 104 S.Ct. at 1890, 80 L.Ed.2d at 439. The Bar plan is a pure rebate plan which places the burden of proving the impropriety of the Bar's expenditure upon the member and uses Gibson's dues until he complains. These features of the Bar's plan have been declared unconstitutional in several Supreme Court cases.

For the foregoing reasons, I dissent.