In the
United States Court of Appeals
For the Seventh Circuit

No. 99-2766

Bernadette Tavernor, et al.,

Plaintiffs-Appellants,

v.

Illinois Federation of Teachers
and University Professionals of
Illinois Local 4100,

Defendants-Appellees.


Appeal from the United States District Court
for the Central District of Illinois, Springfield Division.
No. 99-3050--Jeanne E. Scott, Judge.


Argued January 21, 2000--Decided September 6, 2000


   Before Posner, Diane P. Wood, and Evans, Circuit
Judges.

   Diane P. Wood, Circuit Judge.  Two points in the
area of public labor relations are by now well
established. First, public employers may have a
collective bargaining agreement with a union that
requires all employees, union members and
nonmembers alike, to contribute to the union's
representational activities--that is, the
agreement may include a "union security clause."
Second, those who object to nonrepresentational
activities of the union have the right to pay
fees that exclude contributions to those
activities--so-called "fair share fees." See
Hudson v. Chicago Teachers Union Local No. 1, 475
U.S. 292, 302 (1986), citing Abood v. Detroit Bd.
of Educ., 431 U.S. 209 (1977).

   In this case, we must assess the system used by
the union representing certain clerical employees
of the University of Illinois at Springfield to
implement those rules, to ensure that this system
respects the First Amendment rights of objecting
employees. The district court upheld the union's
system. We conclude, however, that even though
the union followed the mechanics of certain
statutory procedures established by the State of
Illinois, its system in operation did not provide
sufficient protection to the objectors. We

therefore reverse and remand for further proceedings.

I

The plaintiff employees work in a bargaining unit represented exclusively by the University Professionals of Illinois, Local No. 4100 (UPI), an affiliate of the Illinois Federation of Teachers (IFT). IFT in turn is an affiliate of the American Federation of Teachers, a national labor organization. The University's collective bargaining agreement (CBA) makes UPI the recognized exclusive bargaining agent for members and nonmembers alike. It also contains a union security clause that requires employees either to join the union or to pay "fair share fees" to cover the cost of their representation in collective bargaining.

Fair share fees are the solution to free rider problems in the collective bargaining context. Unions assist employees by helping them bargain more effectively with employers. The idea is the simple "strength in numbers" aphorism: if employees are united and speak with one voice, they are more likely to get what they want. Not all employees want to join unions, however. This presents a possible free-rider problem: because all employees are covered by a collective bargaining agreement, it is possible for employees who elect not to join the union to reap the benefits of the union's representation without paying the dues associated with union membership. And if representation is "free", fewer employees would elect to join unions, leaving it to their co-workers to bear the costs. Fair share fees ensure that the costs of collective bargaining are borne by all employees, regardless of their choice to join the union. Lehnert v. Ferris Faculty Ass'n, 500 U.S. 507, 517 (1991); Communications Workers of America v. Beck, 487 U.S. 735, 748 & n.5 (1988); Ellis v. Brotherhood of Ry., Airline & S.S. Clerks, 466 U.S. 435, 447 (1984); Abood, 431 U.S. at 221-22, 224.

The Illinois legislature has adopted the Illinois Educational Labor Relations Act (IELRA), 115 ILCS 5/1 et seq., which establishes procedures governing collective bargaining arrangements between public educational institutions and their employees, including the assessment of fair share fees for objectors. See 115 ILCS 5/11. The Illinois Education Labor Relations Board (IELRB) administers the IELRA, and among other things, resolves disputes between objectors and unions regarding fair share fees. Under the IELRA and the governing regulations, see Ill. Admin. Code sec. 1125.10 et seq., unions

and employers may agree to charge fair share fees to public employees who are not members of the union but are covered by the collective bargaining agreement. The union certifies the amount of the fair share fee to the employer. The amount certified can neither exceed union dues nor include any costs related to supporting candidates for political office. The employer deducts the certified fair share fee from nonmembers' earnings and pays the fee to the union. At least two weeks before the deductions begin, the union must provide notice of the fair share fee to all nonmembers as well as the right to object to that amount. Ill. Admin. Code sec. 1125.20.

A nonmember has six months after the first deduction in which to object to the fair share fee; the nonmember waives any objection to fees collected before the objection. Id. sec. 1125.30. Objections are effective only for the year in which the fair share fee is sought, id., so objections must be renewed on an annual basis. If a nonmember objects to the amount of the fair share fee (either in whole or in part), the objecting nonmember's full fee continues to be deducted; however, the fee (or the portion thereof in dispute) is placed in an interest-bearing escrow account managed by the IELRB or the union. The IELRB then consolidates all fair share fee objections for a single bargaining unit and conducts an administrative hearing to determine the correct fair share fee. Id. sec. 1125.60. The hearing is held within 30 days of the last possible time for filing objections--in other words, seven months after the first deduction. Id. sec. 1125.80.

IFT developed the fair share fee program adopted by UPI. Because UPI represents educational employees, it uses the school year calendar for the calculation (and deduction) of fair share fees. As provided for in the IELRA, the University automatically deducts fair share fees from nonmembers' paychecks. In this case, UPI has instructed the University to deduct an amount equivalent to 100 percent of union dues as nonmembers' fair share fee payment. The notice UPI sent to nonmembers indicates the amount of the fair share fee (expressed as a percentage of union dues) as well as information about how the fee was calculated. For the 1997-98 school year, the notice said that the fair share fee was 84.46 percent of full union dues; for the 1998-99 school year it was 86.78 percent. Notwithstanding those calculated percentages, however, in both years the notice also said that a fair share fee equivalent to 100 percent of union dues would be deducted. The notice indicated how objections could be filed with the IELRB. As the IELRA

requires, when someone objects, the full amount of the deducted fees (i.e., 100 percent of the union dues for that objector) is held in an interest bearing escrow account managed by the IELRB. If a person does not object within the period allowed, he waives the right to object to the fee, and the UPI receives the amount deducted (in this case, 100 percent of union dues) in its entirety.

The plaintiffs filed objections to the collection of funds exceeding the calculated fair share fee with the IELRB for both the 1997-98 and 1998-99 school years. As the system required, the University continued to deduct an amount equivalent to 100 percent of union dues from their paychecks, but it placed these funds in an escrow account instead of turning them over to the union. In July 1998, the IELRB consolidated the plaintiffs' objections to the 1997-98 fees and set a hearing for September 10, 1998. The hearing was eventually held on October 30, 1998; the Administrative Law Judge rendered a decision on May 17, 1999.

Just before the IELRB hearing was scheduled to take place, IFT had offered all objectors an immediate refund, in an amount greater than the calculated non-chargeable portion of the fee, in exchange for dropping their objections. The Labor Board approved the withdrawal of their charge and disbursed their escrowed fees, thinking that the settlement had been accepted. In fact, it had not been. Instead, the plaintiffs had withdrawn their objections without accepting the settlement offer, without notifying the union, and without telling their lawyer. (This explains why these plaintiffs, although listed as objectors at the initial stages of the proceeding, are absent from the list of objectors at the conclusion of the IELRB proceedings.) The union attempted to rectify the situation when it discovered what had happened by determining the amount that had been disbursed from the plaintiffs' escrowed funds, adding interest at the prime rate through May 1999, and sending the non-chargeable amounts to the plaintiffs' attorney.

None of this satisfied the plaintiffs, who were out to establish a broader principle. Tavernor, along with Richard Barnes, Carol Dixon, Cynthia Ervin, Donna Johnson, Peggy Kitchen, Ginger Mayer, Angela Pezold, Marcia Rossi, and Linda Squires, filed a class action complaint on behalf of (1) all nonmembers who were not notified that they could object to the Union's collection of fees for indisputably nonchargeable activities and have their fee reduced accordingly and (2) nonmembers who took the step of making their objection known to UPI. The plaintiffs asked to

have the union fair share fee collection procedure declared a violation of the First Amendment. They argued that UPI's process does not include sufficient procedural safeguards (as required under the First and Fourteenth Amendments) and that UPI must reduce fair share fees upon receipt of the nonmembers' objection for all costs that are indisputably not chargeable to collective bargaining. By way of relief, they sought an injunction against the collection of fair share fees and a refund with interest of all funds they had paid which were not chargeable to them as a fair share fee. UPI and IFT moved to dismiss the complaint for failure to state a claim (or, in the alternative, to defer to proceedings before the IELRB). The district court treated the motion as one for summary judgment and ruled in favor of UPI and IFT.

II

The Supreme Court has laid out three requirements for the collection of "fair share fees": the union must (1) provide "an adequate explanation of the basis for the fee"; (2) give the nonmember "a reasonably prompt opportunity to challenge the amount of the fee before an impartial decisionmaker"; and (3) have "an escrow for the amounts reasonably in dispute while such challenges are pending." Hudson, 475 U.S. at 310. Because the payment of a fair share fee has an effect on the objectors' First Amendment rights, the procedures used to collect "fair share fees" must be "carefully tailored to minimize the infringement" on those rights. Id. at 303; see also Lehnert, 500 U.S. at 519 (holding union's expenses for activities germane to the collective bargaining process may be chargeable to nonmembers where they do not "significantly add to the burdening of free speech that is inherent in the allowance of an agency or union shop"). The employee bears the burden of protecting her First Amendment rights. If she believes that the union has incorrectly calculated the fair share fee or has included expenses related to political or other expression to which the employee does not wish to contribute, she must make her objection known. International Ass'n of Machinists v. Street, 367 U.S. 740, 774 (1961). Once an employee objects, the burden shifts to the union to demonstrate that its fair share fee was correctly calculated and does not include expenditures related to non-germane matters. Hudson, 475 U.S. at 306.

Because the employees' First Amendment rights are at stake, "the procedure [must] be carefully tailored to minimize the infringement." Hudson, 475 U.S. at 303; see also id. at 309 (specifying

requirements "necessary to minimize both the impingement and the burden"). For the objector, even a requirement that she support the collective bargaining representative through fair share fees potentially affects her First Amendment rights and may "interfere in some way with [her] freedom to associate for the advancement of ideas, or to refrain from doing so, as [s]he sees fit." Abood, 431 U.S. at 222. For this reason, it is critically important to ensure that the fair share fee collection mechanism is no more burdensome on employees' rights than necessary. See Hudson, 475 U.S. at 307 n.20; see also Dashiell v. Montgomery County, Md., 925 F.2d 750, 754 (4th Cir. 1991). Furthermore, "[t]he amount at stake for each individual dissenter does not diminish [the First Amendment] concern. For, whatever the amount, the quality of respondents' interest in not being compelled to subsidize the propagation of political or ideological views that they oppose is clear." Hudson, 475 U.S. at 305.

In general, there are three systems used to collect fair share fees, some of which satisfy these concerns more easily than others. Under a rebate system, the union collects the full amount of dues, spends them, and then refunds to nonmembers the portion that it was not allowed to exact from nonmembers in the first place (that is, the amount exceeding collective bargaining costs). Rebates of this kind--where the union itself has the disputed funds for a period of time--are no longer used in contexts where First Amendment rights are in play (such as the cases of public employers or those falling under the Railway Labor Act). The problem is simple: such a system effectively requires the objector to make an involuntary (even if temporary) loan to the union that can be used for expenses not related to collective bargaining. See Ellis, 466 U.S. at 443-44.

In striking down rebate systems, however, the Court also signaled what kind of system would be acceptable, noting that "there are readily available alternatives, such as advance reduction of dues and/or interest-bearing escrow accounts, that place only the slightest additional burden, if any on the union." Id. In an advance reduction system, the union collects only what it has calculated to be the fair share fee (with, perhaps, a slight cushion to cover any possible calculation errors) and no more. In an escrow system (or "deduction-escrow-refund" system, as it has been described, Grunwald v. San Bernadino City Unified Sch. Dist., 994 F.2d 1370, 1372 (9th Cir. 1993)), the union collects some amount from nonmembers (either an amount equal to full union dues, the estimated "fair share fee," or the fair

share fee plus some cushion). The union places the fees collected from nonmembers into an interest-bearing escrow account. Depending on the particular system, the union may place into escrow either the full amount collected or only the amount reasonably in dispute. The funds remain in escrow, and cannot be spent by the union, until one of two things happens: either (1) the nonmember does not object to the union's collection of the funds, in which case the funds are released to the union, or (2) the nonmember objects to the collection of the funds and the proper fair share fee amount is decided by an impartial decisionmaker. In either case, the party who has a right to the funds receives them with interest.

The UPI procedure at issue here is of the deduction-escrow-refund ilk. What is somewhat unusual about the procedure is that UPI collects and escrows an amount that it concedes is more than the calculated fair share fee. That is, rather than collect an amount equal to or only slightly exceeding the 80-odd percent of union dues that UPI has calculated is allocable towards "chargeable" expenses (that is, costs associated with collective bargaining), UPI has the university collect 100 percent of union dues from all employees of the bargaining unit, members and nonmembers alike. It does so even though in recent memory its chargeable expenses have never gone much higher than approximately 85 percent of union dues. The objectors thus have two points to make: first, the conventional complaint about the union's calculation of its fair share charge (i.e., what expenses are chargeable), and second, the more uncommon complaint about the systematic collection of amounts that admittedly exceed the costs of collective bargaining. The plaintiffs claim that this is not the kind of narrowly tailored procedure required by the Supreme Court's decisions, and that nothing less than some sort of advance reduction system would be constitutional under Hudson.

The circuits are split as to whether such an absolute rule exists. Most have found that either advance reduction or a "deduction-escrow-rebate" approach can satisfy Hudson, as long as the particular procedure provides sufficient information to nonmembers and a prompt, impartial method through which nonmembers can challenge the calculation of the fee. See Grunwald, 994 F.2d at 1373-76; Pilots Against Illegal Dues v. Air Line Pilots, 938 F.2d 1123, 1132-33 (10th Cir. 1991); Gibson v. The Florida Bar, 906 F.2d 624, 631 (11th Cir. 1990); Crawford v. Airline Pilots Ass'n Int'l, 870 F.2d 155, 161 (4th Cir. 1989); Hohe v. Casey, 868 F.2d 69, 72 (3d Cir. 1989); Andrews v. Educational Ass'n of Cheshire, 829

F.2d 335, 339 (2d Cir. 1987). These courts have found that escrow accounts satisfy the First Amendment, because (unlike a rebate) an escrow does not give the union even temporary use of the dissenters' funds to pay for political or other sorts of speech. They also rely on language in Ellis suggesting that escrow accounts are a constitutional alternative. See 466 U.S. at 444. Other courts have not read Ellis quite that broadly, observing that the Court may have had in mind the use of escrow accounts only for disputed amounts. In Hudson, for example, it referred to an escrow "for the amounts reasonably in dispute while such challenges are pending." 475 U.S. at 310 (emphasis added). This has led the Sixth Circuit to hold that only advance reductions comply with the First Amendment. See Tierney v. City of Toledo, 824 F.2d 1497, 1504-05 (6th Cir. 1987). Tierney held unconstitutional a fair share collection procedure under which the union collected a fee equal to 100 percent of union dues and refunded the nonchargeable amount upon objection. See also Damiano v. Matish, 830 F.2d 1363, 1370 (6th Cir. 1987).

In addition to the question whether an advance reduction is the only constitutionally acceptable option, several other aspects of fair share fee procedures have also come under attack. See, e.g., Kidwell v. Transportation Communications Int'l Union, 946 F.2d 283, 304 (4th Cir. 1991) (must the calculation of the fair share fee be done by professional accountants or an independent auditor); Ping v. National Educ. Ass'n, 870 F.2d 1369, 1374 (7th Cir. 1989) (same); Pilots Against Illegal Dues, 938 F.2d at 1132 (how accurate must the calculation be and what level of detail is required); Dashiell, 925 F.2d at 756 (same); Shea v. International Ass'n of Machinists and Aerospace Workers, 154 F.3d 508, 515 (5th Cir. 1998) (can an annual objection be required); Gibson, 906 F.2d at 632 (composition of arbitral panel). The theme that we perceive in these cases is a familiar one: each fair share fee procedure must be assessed as a whole, to ensure that it meets the "careful tailoring" requirement of Hudson.

Our review of UPI's fair share collection procedure convinces us that the burdens it places on objectors are too great under Hudson. To begin with, the independent dispute resolution procedure is far from prompt. Under the IELRA, objections do not even begin to be processed until six months after the initial deduction is made. The objections must then be consolidated and a hearing scheduled. It then takes an additional four to six months for the decision to be made. And, if either the union or the objectors disagree with the decision, the funds

remain in escrow pending the resolution of an appeal. Thus, for at least a year, the objector does not have access to the portion of her funds that no one ever claimed the union could keep. Cf. Grunwald, 994 F.2d at 1372-73 (upholding fair share fee dispute procedure where lag between objection and decision was between two and three months). Moreover, the IELRA requires objections to be renewed annually, which places an additional burden on objectors. No sooner does the objector complete one round than, like Sisyphus with his rock, he must begin anew with another. See Shea, 154 F.3d at 515.

It is important to note that the IELRA system itself does not require the 100% escrow that UPI uses. Our remarks should therefore not be taken as facial criticism of the IELRA; we are addressing only the way that mechanism is being used here. The union collects some funds that it realizes it would not be entitled to retain over a proper objection (but that it is equally entitled to keep if the nonmember chooses not to object). Before the deductions are made, the union has calculated the fair share fee (84 to 86 percent of union dues). The union then requests the university to deduct an amount equivalent to full union dues from nonmembers' paychecks. From the point of view of the dissenting subset of nonmembers (however large that may be), although there is no dispute regarding approximately 15 percent of the funds collected, they are nonetheless deprived of those funds for well over a year. This system places a significant burden on the objection process.

True, UPI responds, but two factors operate together to save it: first, the union does not get the benefit of the funds either, because they are in an outside escrow account managed by IELRA, and second, when the dust settles the objectors get the monies they are due with a proper interest payment. UPI does bear a slight burden under the disputed system: it, too, is deprived of funds to which it is indisputably entitled while dissenters' objections wend their way through the administrative system. Indeed, as a percentage, the union loses far more, because its ultimate share of the escrowed funds is some 85 percent of the total, while the dissenters' share is only about 15 percent. From a legal point of view, however, this simply rephrases the question: can the union deprive the objectors of the use of their money for lengthy periods of time, as long as the ultimate payment is with interest? As a practical matter, we agree that the system seems a bit odd at first: why would UPI design a system that results in its being deprived of funds due to it? There are two possible answers. The answer may lie in the

relative size of the two classes of employees. At oral argument, counsel for UPI estimated that out of 80,000 represented employees, fewer than 100 object in any given year. By certifying the maximum fair share fee possible (100 percent of dues), UPI may be maximizing what it stands to gain through forfeiture. Coupling that fact with the reality that the 15 percent shares for the objectors are relatively small dollar amounts in absolute terms, the union's incentive to handle things this way may be more apparent. We therefore do not think that the reciprocity of burdens saves this system.

UPI's point about interest is in principle a valid one. In case after case, we point out that a person is fully compensated for the temporary deprivation of money if the repayment is made with a market rate of interest. See, e.g., Medcom Holding Co. v. Baxter Travenol Lab., Inc., 200 F.3d 518, 519 (7th Cir. 1999); In re Milwaukee Cheese Wis., Inc., 112 F.3d 845, 849 (7th Cir. 1997). If the money is in an escrow account, the objector has given nothing to the union to use, answering the Supreme Court's objection in Ellis. And if the ultimate repayment after the adjudication is over is made with interest, there is no economic loss. The problem with this picture, however, lies in the Supreme Court's caution that the procedures for administering fair share systems must be structured so as to minimize the burden on the objectors' First Amendment rights. Anyone who has read even the first thing in law and economics literature (perhaps Ronald Coase's Nobel Prize-winning works, including his path-breaking article on The Problem of Social Cost, 3 J. Law & Econ. 1) will be familiar with the concept of transaction costs. The interest payment will compensate the objectors for the lost use of their money during the adjudicative process, but it will not compensate them for the transaction costs they incur in order to obtain it. The Supreme Court has not asked for the impossible--it has not demanded that unions find a way to reduce transaction costs to zero--but it has sent the message that unions must use systems that will keep these costs to a manageable level. See also Grunwald, 994 F.2d at 1375 (stressing the need to keep procedural burdens down, especially in light of the small sums involved); Shea, 154 F.3d at 515 (same). It is in that light, therefore, that we complete our review of the system the UPI uses.

In support of its procedure, UPI relies heavily on the Ninth Circuit's opinion in Grunwald, in which the court upheld a deduction-escrow-refund procedure that the union thinks was similar to its own. But the devil is in the details, and it is the details of the Grunwald system that

distinguish it from UPI's. In Grunwald, as here, an amount equal to 100 percent of union dues was deducted from nonmembers' paychecks, and nonmembers' fees were placed in an interest-bearing escrow account. The difference lay in precisely the transaction cost point we have just made. In Grunwald, nonmembers did not have to go through such a cumbersome dispute procedure in order to collect their refund. Instead, once a nonmember submitted a notice to the union objecting to the use of her fees, she could either accept the union's calculation of the fair share fee, in which case she would receive a refund from the union for the excess, or, if she disputed the union's calculation of the fee, she could request that the appropriate fee be determined through arbitration. See Grunwald, 994 F.2d at 1372-73. The contrast with the current system is immediately evident. (We do not believe that the union's offer here to settle the case on the eve of litigation transforms this system into the Grunwald one; settlement is a matter of grace, while the system in Grunwald was a matter of right.)

In our case, those who wish to object (who, it is worth noting, may be a smaller group than those who do not choose to become union members) bear a substantial burden no matter what they do: they can object and spend substantial time and energy to collect their refund, or they can forgo the hassle of objecting and forfeit the funds. The union only benefits: it either gets exactly what it is due or, for those who do not have the time or energy to fight, more than what it is due. We emphasize that these observations pertain to the system we are reviewing in this particular case, where there is a persistent difference of approximately 15 percent between the amounts collected and the fair share fee. Unions are entitled to use reasonable estimates to collect amounts that include a cushion. The transaction cost argument, in short, is a double-edged sword. Nothing we say here should be understood to mean that objectors have the right to impose unreasonable transaction costs on unions either, as for example by forcing them to engage in elaborate escrow and arbitration procedures over a couple of dollars, as long as a process is in place to make sure the books are ultimately balanced properly for all concerned. Our only point is that these facts do not present such a case for the union.

UPI's primary argument for its objection procedures is that the current system is more simple for the University's payroll. We are not convinced that it would be particularly hard for UPI to instruct the University to deduct the calculated fair share fee plus a slight cushion

(1-2 percent, for example) from each objector and place the cushion plus any amounts in dispute in escrow, or for the University to adjust each employee's deduction once he or she objects. (There would be no need for such an instruction until an objection was filed, however.) Payroll systems process different sorts of deductions for different employees all the time. We also note that "[t]he IFT amended the recommended fair share fee program for the 1997-98 membership year from an advance reduction to a post-objection refund program." Affidavit of James Geppert, Jr., Secretary-Treasurer of IFT, dated April 13, 1999. If the advance reduction was possible a few years ago, we find it hard to understand why it is unmanageable today. In addition, the union does not argue it would be too burdensome for it to figure out who the objecting employees are each year. Cf. Grunwald, 994 F.2d at 1376 (finding adequate explanation for deduction-escrow-refund system where employees were employed on a year-to-year basis).

Furthermore, UPI's present system is not the only one available to it. There is at least one other procedure it could use to deduct its fair share fees that would both comport with the IELRA and be less burdensome on objectors' free speech rights. The UPI could fashion a system similar to the one approved in Grunwald. That is, the UPI could continue to certify a fair share fee equal to 100 percent of union dues. Upon objection, however, the UPI would deduct only the calculated fair share fee from the objectors' paychecks (that is, the percentage of union dues that the UPI currently includes in its notice). If the objecting employee contested the amount calculated by the UPI, the amounts in dispute could be placed in escrow and the statutory procedures followed for the adjudication of that dispute. Cf. Grunwald, 994 F.2d at 1372-73.

We reiterate finally that in coming to this decision we need not and do not strike down the IELRA. UPI and IFT are correct that Illinois law provides "the exclusive method for handling fair share fees upon the filing of an objection by an employee." Ill. Admin. Code sec. 1125.10. The UPI procedure tracks the IELRA--the union provides notice of the fair share fee, holds objectors' fees in escrow, and allows an impartial decisionmaker (the IELRB) to determine if the fair share fee (i.e. the chargeable expenses) was correctly calculated. What is at issue here is not the system, but the inputs into that system: that is, whether the union may collect more than its calculated fair share fee and force objectors to take action in order to get their money back. In other words, what is at stake is not the facial validity of the IELRA; it is only the

application of those procedures in UPI's contract
with the University. See Robinson v. State of New
Jersey, 806 F.2d 442, 446-47 (3d Cir. 1986)
(discussing difference between facial and as
applied challenges in this context).

III

   We conclude that UPI's practice goes beyond
what Hudson permits because it imposes excessive
burdens on objectors without adequate
justification. We therefore REVERSE the district
court's summary judgment for UPI and IFT and REMAND
to the district court for further proceedings
consistent with this opinion.