994 F.2d 1370
 143 L.R.R.M. (BNA) 2305, 61 USLW 2740,
126 Lab.Cas. P 10,834,
83 Ed. Law Rep. 963
 Debra J. GRUNWALD; Lewis N. Adams; Vicki S. Burdeaux;
Maria Buselle, et al., Plaintiffs-Appellants,
v.
SAN BERNARDINO CITY UNIFIED SCHOOL DISTRICT; Shelby
Obershaw, President, SBCUSD; Hardy L. Brown, Vice
President, SBCUSD; Elisa Diaz, School Board Member, et al.;
San Bernardino Teachers Association, CTA/NEA, Defendants-Appellees.
Debra J. GRUNWALD; Lewis N. Adams; Vicki S. Burdeaux;
Maria Buselle, et al., Plaintiffs-Appellees,
v.
SAN BERNARDINO CITY UNIFIED SCHOOL DISTRICT; Shelby
Obershaw, President, SBCUSD; Hardy L. Brown, Vice
President, SBCUSD; Elisa Diaz, School Board Member, et al.;
San Bernardino Teachers Association, CTA/NEA, Defendants-Appellants.
 Nos. 88-6617, 88-6619.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Jan. 29, 1990.
Decided May 19, 1993.
 
 Milton L. Chappell, Glenn M. Taubman, Nat. Right to Work Legal Defense Foundation, Inc., Springfield, VA and James W. Marsella, Ventura, CA, for plaintiffs-appellants.
 Robert H. Chanin, Jeremiah A. Collins, Bredhoff & Kaiser, Washington, DC, and Diane Ross, Burlingame, CA, for defendant-appellee, San Bernardino Teachers Ass'n.
 Ronald C. Ruud and Karen E. Gilyard, Atkinson, Andelson, Loya, Ruud & Romo, San Bernardino, CA, for defendants-appellees, San Bernardino City Unified School Dist.
 Appeal from the United States District Court for the Central District of California.
 Before: D.W. NELSON, BRUNETTI and KOZINSKI, Circuit Judges.
 KOZINSKI, Circuit Judge:
 
 
 1
 In this dispute between an employee union and nonmember agency fee payers, we resolve the tension between the First Amendment's guarantee of free speech and the idiomatic truth that there's no such thing as a free lunch.
 
 Facts
 
 2
 Plaintiffs are nonunion teachers employed by the San Bernardino Unified School District (the District). Even though they are not members of the San Bernardino Teachers Association (the SBTA or the union), plaintiffs must contribute to it. California law requires these payments because the SBTA and the District have an agency shop agreement under which the SBTA is the teachers' exclusive collective bargaining agent. See Cal.Gov't Code § 3502.5(a) (Deering 1982). As beneficiaries of collective bargaining, plaintiffs must help pay for it. To this end, $30 a month is deducted from their paychecks, which is the same as the amount paid by union members.
 
 
 3
 However, the union carries out some activities unrelated to collective bargaining, such as contributing to political candidates. Though part of the union members' $30 pays for these nonrepresentational activities, the agency fee payers[1] may not be required to support them. Abood v. Detroit Bd. of Educ., 431 U.S. 209, 234-37, 97 S.Ct. 1782, 1799-1801, 52 L.Ed.2d 261 (1977). Therefore, agency fee payers may not be charged the same amount as union members; they must only be charged a lesser amount reflecting a pro rata portion of the union's expenditures on collective bargaining activities. In an effort to satisfy this requirement, the District puts the amounts deducted from the paychecks of agency fee payers in an escrow account. Agency fee payers can get a refund of a portion of these amounts under a procedure set up by agreement between the District and the union. Plaintiffs challenge the constitutionality of this "deduction-escrow-refund" procedure.
 
 
 4
 The mechanics of the collection procedure are simple: One tenth of the annual union dues is deducted from every teacher's paycheck on the 30th of each month that school is in session--September through June. The union gets the deduction from the paychecks of the union members, but all of the agency fee payers' deductions are put into an independently managed interest-bearing escrow account. The fees stay in escrow until the refund procedure concludes.
 
 
 5
 The refund process is set in motion no later than October 15th. By that date, the SBTA sends notice to all nonmember contributors telling them how to obtain a rebate of funds not used for collective bargaining. Accompanying this notice is a calculation of the amount the SBTA deems chargeable to representational activities.
 
 
 6
 To obtain a refund, nonmembers must submit, no later than November 15, a letter objecting to the union's discretionary use of their fees. After they object, teachers may choose one of two routes to get their refund. They can accept the SBTA's calculation of the chargeable percentage, in which case the SBTA gives them a rebate for the entire year by December 7. Or they can dispute the union's allocation and request that the percentage be determined by arbitration. If they choose arbitration, an arbitrator chosen by the American Arbitration Association decides what portion of the total payment is chargeable to collective bargaining. The challenging fee payers and the SBTA may present evidence, orally or by affidavit, at a hearing to be held no later than December 15--a month after objections are made. The arbitrator must issue his award within 30 days of the close of the hearing, and the SBTA must pay the rebate within 20 days of the arbitrator's decision. Assuming a hearing of roughly a week, the payment date falls sometime in mid-February.
 
 
 7
 Plaintiffs challenge these SBTA procedures under 42 U.S.C. § 1983. They claim the District may not, even temporarily, deduct from their paychecks more than what the union is entitled to receive for collective bargaining activities. Plaintiffs argue that even the temporary retention of funds not allocable to collective bargaining violates their First Amendment right against compelled speech.
 
 Discussion
 
 8
 * Plaintiffs base their argument on the now well-established principle that requiring nonmember employees to contribute to the union's ideological activities runs afoul of the First Amendment. The foundations of this idea are not new: Thomas Jefferson wrote that " 'to compel a man to furnish contributions of money for the propagation of [religious] opinions which he disbelieves, is sinful and tyrannical.' " Abood, 431 U.S. at 234 n. 31, 97 S.Ct. at 1799 n. 31 (1977) (quoting I. Brant, James Madison: The Nationalist 354 (1948)). As Abood makes clear, this reasoning applies equally to compelled political contributions. 431 U.S. at 234-35, 97 S.Ct. at 1799-1800. Thus, the First Amendment protects people from having to put their money where their mouth isn't.
 
 
 9
 Recent Supreme Court opinions reaffirm the First Amendment's ban on compelled subsidies of ideological causes. See, e.g., Keller v. State Bar, 496 U.S. 1, 15, 110 S.Ct. 2228, 2236, 110 L.Ed.2d 1 (1989); Chicago Teachers Union v. Hudson, 475 U.S. 292, 301-04, 106 S.Ct. 1066, 1073-75, 89 L.Ed.2d 232 (1986). However, the Court has stated that union security agreements will not violate this prohibition, provided there are adequate protections for the First Amendment rights at stake. Id. at 301, 106 S.Ct. at 1073; Ellis v. Brotherhood of Railway Clerks, 466 U.S. 435, 444, 104 S.Ct. 1883, 1890, 80 L.Ed.2d 428 (1984).
 
 
 10
 Two basic principles emerge from the cases reviewing agency shop agreements: First, nonmembers have an absolute right not to support speech they disagree with, so the union must not, under any circumstances, be able to use their money for ideological purposes. Abood, 431 U.S. at 235-36, 97 S.Ct. at 1799-1800 (1977); Railway Employees' Dep't v. Hanson, 351 U.S. 225, 238, 76 S.Ct. 714, 721, 100 L.Ed. 1112 (1956). Second, nonmembers have a further First Amendment right to a fair, prompt and effective procedure, both for identifying what sums they are required to pay and, if more than that is collected, for obtaining a refund of the excess. Hudson, 475 U.S. at 306-09, 106 S.Ct. at 1075-77. For convenience, we will refer to the first of these as the substantive First Amendment right and to the second as the procedural First Amendment right.
 
 A. The Substantive First Amendment Right
 
 11
 The Supreme Court in Ellis announced a few of the basic rules for safeguarding nonmembers' substantive First Amendment right. An absolute baseline is that nonmembers may never be charged more than is needed to cover "expenditures [which] are necessarily or reasonably incurred" in collective bargaining. 466 U.S. at 448, 104 S.Ct. at 1892. Moreover, money collected from nonmembers may not be used, even temporarily, for ideological purposes, lest they be forced to make "an involuntary loan" which the union can use to promote its political ends. Id. at 444, 104 S.Ct. at 1890. In a passage highly relevant to our case, Ellis observed that, to avoid forced subsidies forbidden by the First Amendment, unions must adopt procedures "such as advance reduction of dues and/or interest-bearing escrow accounts." Id. Taking our lead from Ellis, we conclude that the District's escrow scheme poses no risk that plaintiffs' substantive free speech rights will be violated.[2]
 
 
 12
 All of the agency fees collected from nonmember employees go into an escrow account; this precludes any dispute about whether the amount placed in escrow is adequate. Any nonmember seeking a rebate of the $80 that would be used for nonrepresentational purposes need only advise the union in writing by November 15. Provided the employee accepts the union's apportionment, the union pays out the $24 already collected by December 7. In addition, it also pays an up-front rebate of the $56 that will be deducted from the employee's paycheck over the next seven months. An objecting employee who questions the apportionment can force the union to arbitrate the matter, with the union paying the cost of the arbitrator. The arbitration takes place in December, and the objecting employee's account is settled by sometime in mid-February. By then, the objector has contributed $40 to the escrow account. He gets the $40 back with interest, plus $40 as an advance payment of the fees that will be deducted from his paycheck during the remaining five months of the school year. In either case, none of the objectors' money is or can be used by the union for ideological purposes. To the contrary, the objector actually makes a small profit.[3] The long and short of it is that plaintiffs cannot establish a substantive free speech violation because none of their money is used, or ever can be used, by the union for non-representational purposes.
 
 
 13
 Plaintiffs nevertheless argue that they suffer a substantive First Amendment injury because they are denied use of their money temporarily, so they can't use it to promote First Amendment causes they support. We seriously doubt that this states a First Amendment injury at all, particularly where plaintiffs are either given an advance rebate or paid interest on their money to make up for lost use. Any other conclusion would turn every tax refund suit--indeed every monetary claim against an entity acting under color of law--into a First Amendment case.[4]
 
 
 14
 In any event, to the extent plaintiffs have suffered an injury it is of a much different character than that contemplated by Abood, Ellis and Hudson. Those cases categorically prohibit only one type of First Amendment harm: use of nonmembers' money to promote causes they do not believe in. The Supreme Court has recognized in those cases and others that this type of injury is particularly grave: To be forced to promote a cause or express sentiments that run contrary to one's conscience is painful in addition to being unjust. This sort of compelled contribution is forbidden under a broad First Amendment protection which the Court has called the "individual freedom of mind." See Wooley v. Maynard, 430 U.S. 705, 714, 97 S.Ct. 1428, 1435, 51 L.Ed.2d 752 (1977) (quoting West Virginia State Bd. of Educ. v. Barnette, 319 U.S. 624, 637, 63 S.Ct. 1178, 1185, 87 L.Ed. 1628 (1943)). The agency shop agreement we test here does not inflict this type of First Amendment harm. As to other types of injury plaintiffs may suffer, Abood, Ellis and Hudson require only a reasonable accommodation. We consider next whether the procedure adopted by the District provides such a reasonable accommodation of plaintiffs' remaining interests.
 
 B. The Procedural First Amendment Right
 
 15
 Even if nonmembers' money can't be used by the union for nonrepresentational purposes, their rights may still be infringed by a deduction-escrow-refund procedure, unless the procedure serves a legitimate purpose and is administered in a fair and impartial fashion. Requiring agency fee payers to go through the inconvenience, embarrassment and delay of recovering even a small sum--practically a sum so small it's hardly worth the hassle--is a burden they cannot be required to bear, unless there's a compelling reason for requiring it and the procedure itself is reasonable.
 
 
 16
 Hudson provides significant guidance in judging the adequacy of the procedure adopted here. Though Hudson noted with approval that the union had created an escrow account to hold 100% of the funds collected from dissenters, the Court commented that an "agency shop agreement itself impinges on the nonunion employees' First Amendment interests, ... because[, for example,] the nonunion employee has the burden of objection." Hudson, 475 U.S. at 309, 106 S.Ct. at 1077. In the end the Hudson court struck down the escrow arrangement offered as a remedy because it remained "flawed in two respects. It [did] not provide an adequate explanation for the advance reduction of dues, and it [did] not provide a reasonably prompt decision by an impartial decisionmaker." Id.
 
 
 17
 We interpret this language in Hudson as expressing a strong preference for identifying nonunion members early enough so that the deduction-escrow-refund procedure can be avoided altogether. To employ the more cumbersome and intrusive deduction-escrow-refund procedure, the union must provide an "adequate explanation," which we interpret to mean that the union must show that the preferred method of doing things is impossible or, at any rate, far more costly or cumbersome.[5] Moreover, where a deduction-escrow-refund procedure is employed, the refund procedure must be reasonably prompt; the employee must be given sufficient information from which to judge the adequacy of the refund;[6] and, if the challenging employee so chooses, the amount of the refund must ultimately be decided by an impartial decisionmaker.
 
 
 18
 As to the first inquiry, the union has provided what we consider to be an adequate explanation for resorting to the deduction-escrow-refund procedure: Public school teachers are employed on a school year by school year basis. Virtually all new employees begin work at the same time--around September 1, when the academic year starts. During September, the District and the union first learn two pieces of information necessary to the administration of the agency shop agreement: the home addresses of all new teachers and, most importantly, the names of the teachers who choose to be agency fee payers that year. Thus, the end of September is the earliest point at which the SBTA can identify all agency fee payers and notify them of their right to a refund.[7] The union, in fact, sends out a notice to agency fee payers advising them of their rights no later than October 15.
 
 
 19
 Under the circumstances it would be highly impractical for the union to separate members from nonmembers and determine the affiliations and addresses of the new teachers before the first monthly paycheck, which comes at the end of September. See Stipulation of the Parties at 16; Brief of Defendant-Appellee San Bernardino Teachers Association at 9 n. 11. Because the procedure is reasonable in light of the annual and fluctuating nature of elementary school employment and the burden on agency fee payers is relatively slight, we hold that this is the type of "appropriately justified advance reduction" approved by the Court in Hudson. 475 U.S. at 309, 106 S.Ct. at 1077.
 
 
 20
 The scheme scrutinized here also satisfies the twin requirements that nonmembers be provided with a "reasonably prompt decision by an impartial decisionmaker." Id. The scheme adopted here was foreshadowed in Hudson:
 
 
 21
 [A] full-dress administrative hearing, with evidentiary safeguards, [need not be] part of the "constitutional minimum." Indeed, we think that an expeditious arbitration might satisfy the requirement of a reasonably prompt decision by an impartial decisionmaker, so long as the arbitrator's selection did not represent the Union's unrestricted choice.... [S]election of an arbitrator frequently does not represent one party's unrestricted choice from a list of state-approved arbitrators.
 
 
 22
 Id. at 308 n. 21, 106 S.Ct. at 1077 n. 21. Regarding the "impartial decisionmaker," providing for selection of an arbitrator by the AAA does not rise to the level of "unrestricted union choice" forbidden by Hudson. Other Circuits agree. See, e.g., Ping v. National Educ. Ass'n, 870 F.2d 1369, 1373 (7th Cir.1989) (plan which calls for AAA selection of an arbitrator satisfies Hudson 's requirement); Damiano v. Matish, 830 F.2d 1363, 1371 (6th Cir.1987) (same); Andrews v. Education Ass'n, 829 F.2d 335, 340 (2nd Cir.1987) (same). Though some have argued that the AAA's origins reveal a pro-union undercurrent, see Andrews, 829 F.2d at 340, plaintiffs raise no such contention here.
 
 
 23
 The refund also appears to be reasonably prompt. If the employee does not object to the union's apportionment, his account is settled by December 7. If he does object, arbitration must begin no later than December 15, a month after the end of the objection period. The arbitrator must issue his decision within a month of the close of the proceedings. Within twenty days from the date of the decision, the union must pay back any rebatable portion of the objectors' dues. The only variable in the schedule is the length of the hearing itself. Since the issues are relatively narrow and the union bears the cost of the arbitrator as well as its own representation expenses, we have no reason to believe that the proceeding will be anything but prompt. Because the arbitration timetable is appropriately speedy, and plaintiffs do not claim that the deadlines aren't being met, we hold that the objection process does not impermissibly impinge on plaintiffs' First Amendment rights.
 
 II
 
 24
 Though individually plaintiffs have very little money at stake in this litigation, they obviously find themselves in an uncomfortable position: They are represented by a union they do not support and to which they are, nevertheless, forced to contribute a portion of their income. It adds insult to injury for them to be deprived, even temporarily, of additional funds to which they are rightfully entitled. This concern is legitimate. But the union has legitimate interests as well. Under applicable law, the union is the bargaining unit's lawful representative, and it is entitled--indeed required--to collect from everyone in the unit a pro rata portion of the funds it expends on representational activities.
 
 
 25
 Ideally, of course, the union would collect from nonmembers only that amount used for representational purposes. But that is not so easy to accomplish in practice. Here, the union has advanced a legitimate reason for the procedure it has adopted: Its ranks and the ranks of the agency fee payers change from year to year. Mindful of this fact, the union has come up with a procedure that strikes a proper balance between the union's right to charge fees for collective bargaining activities and the plaintiffs' First Amendment right to be free from forced contribution to causes with which they disagree. Tyranny of the majority this is not.
 
 
 26
 AFFIRMED.
 
 
 27
 BRUNETTI, Circuit Judge, dissenting.
 
 
 28
 The only issue before us in this case is the constitutionality of the "deduction-escrow-refund" procedure used by the District and the Union to collect agency fees from the nonunion teachers, the agency fee payers. The precise question is whether the District can deduct the full union dues from agency fee payers' paychecks in September and not pay a rebate to the objecting fee payers until December 7 at the earliest. To state it another way, can the District deduct nonchargeable amounts from fee payers' paychecks and hold them in escrow for four months?
 
 
 29
 As the majority notes, a union may satisfy the requirements of the First Amendment by adopting procedures "such as advance reduction of dues and/or interest-bearing escrow accounts." Ellis v. Brotherhood of Ry. Clerks, 466 U.S. 435, 444, 104 S.Ct. 1883, 1890, 80 L.Ed.2d 428 (1984). However, Ellis did not set forth the standards that reviewing courts should apply to decide when the use of such procedures is justified.
 
 
 30
 In Chicago Teachers Union v. Hudson, 475 U.S. 292, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986), the Supreme Court addressed the first of these options, advance reduction of dues, and identified three conditions that an advance reduction procedure must satisfy. First, it must provide nonmembers with an "adequate explanation" of the basis for calculating the agency fee so that potential objectors have the means to determine whether that fee is in fact fairly calculated. Id. at 310, 106 S.Ct. at 1077. Second, if a nonmember objects to the calculation, the procedure must provide "a reasonably prompt opportunity to challenge the amount of the fee before an impartial decisionmaker." Id. Finally, the procedure must provide "an escrow for the amounts reasonably in dispute while such challenges are pending." Id.
 
 
 31
 The procedure at issue here, however, is not "an advance reduction of dues" (the first Ellis option), but rather an "interest-bearing escrow account" (the second Ellis option). The District deducts from the fee payers' paychecks the full amount of union dues; it does not provide for an "advance reduction" as did the teachers' union in Hudson. For this reason, the majority's statement that "this is the type of 'appropriately justified advance reduction' approved by the Court in Hudson " is erroneous. We therefore cannot directly apply the Hudson criteria to this procedure. Because the Supreme Court has not set forth the standards that reviewing courts should use to judge the validity of Ellis interest-bearing escrow accounts, we must do so ourselves.
 
 
 32
 The majority opinion sets forth a two-pronged test. First, the Union must provide an "adequate explanation" for using the deduction-escrow-refund procedure: "The union must show that the preferred method of doing things is impossible or, at any rate, far most costly or cumbersome." The majority notes in n. 5 that this "preferred method" is the "advance reduction" procedure itself, because this procedure is less of an infringement on nonmembers' First Amendment rights. If the Union satisfies the "adequate explanation" requirement, it must then make its procedure as fair and rapid as possible by satisfying the conditions that Hudson imposes on advance reduction plans. I agree with the second prong, but I disagree with the majority's statement and application of the first prong.
 
 
 33
 The issue involved has been defined by the court in Abood, that nonunion employees do have a constitutional right to prevent the Union's spending a part of their required service fees to contribute to political candidates and to express political views unrelated to its duties as exclusive bargaining representative. Hudson, 475 U.S. at 302, 106 S.Ct. at 1073. The objective in devising a procedure for collecting the appropriate amount from nonunion employees must be to devise a way of preventing compulsory subsidization of ideological activity by employees who object, without restricting the Union's ability to require every employee to contribute the cost of collective-bargaining activities. Id. at 302, 106 S.Ct. at 1073.
 
 
 34
 The "agency shop" is already a "significant impingement" on employees' constitutional rights. Ellis, 466 U.S. at 455, 104 S.Ct. at 1896. The First Amendment requires that the fee collection procedure be carefully tailored to minimize further infringement on agency fee payers' rights, and the nonunion employee whose First Amendment rights are affected must have a fair opportunity to identify the impact of government action on his interests and to assert a meritorious First Amendment claim. Hudson, 475 U.S. at 303, 106 S.Ct. at 1074. The District and the Union accordingly have a responsibility to provide procedures that minimize the impingement and that facilitate a nonunion employee's ability to protect his rights. Id. at 307, n. 20, 106 S.Ct. at 1076, n. 20. Advance reduction of dues and/or interest-bearing escrow accounts are acceptable procedures. Id. at 304, 106 S.Ct. at 1074.
 
 
 35
 As to the second prong, the procedure adopted by the District and the Union meets the Hudson tests because the notice given on October 15 gives the fee payers an adequate explanation of the basis for the Union calculation of the fee and the arbitration procedure provides a prompt and fair opportunity to challenge the calculation before an independent decisionmaker. Where the procedure fails is that it is not "carefully tailored to minimize the infringement" on nonmembers' First Amendment rights, because for four months it deprives the fee payer of amounts that are to be refunded. The District and the Union fail to justify their failure to use procedures which they have already tried or considered which impinge less on the fee payers' rights.[1] In fact, the procedure as adopted is obviously for the convenience of the District and the Union with no consideration of the infringement on the fee payers' rights.
 
 
 36
 The majority asserts that "the end of September is the earliest point at which the [Union] can identify agency fee payers and notify them of their right to a refund," and that therefore it would be impossible or at least highly impractical to reduce nonmembers' dues in advance. The majority also notes in n. 7 that the Union could further minimize the burden on agency fee payers by assuming that "those teachers who opted to be agency fee payers in one year would want to continue to be agency fee payers in the next," but that the Constitution does not require the Union to take on the burden of doing so.
 
 
 37
 However, the evidence indicates that the Union already operates under this assumption, and that therefore it cannot provide an "adequate explanation" for failing to use an advance reduction procedure. The Union knows at the beginning of each school year who the existing agency fee payers are; it just doesn't know which of the new teachers will decide to join their ranks. See Stipulation of the Parties at 16 ("new teachers are typically given 30 days to decide whether to join the Union or become a fee payer.") (emphasis added). The Union assumes that existing fee payers will continue to desire that status. See Exhibit 9 to Stipulation at 166 ("[a]t the beginning of the fiscal year, CTA shall place into an independently-managed interest-bearing account all CTA and NEA agency fees received from fee payers.") (emphasis added); Exhibit 10 to Stipulation at 168 ("[f]rom the start of this school year, CTA has been placing all CTA and NEA agency fees received into an interest-bearing escrow account.") (emphasis added). Clearly, then, the Union could use an "advance reduction" procedure for existing fee payers and a deduction-escrow-refund type procedure for new teachers who later choose to become agency fee payers.
 
 
 38
 The Union proffers several reasons for its refusal to use such a system. First, it states that it doesn't know teachers' new addresses until the end of September. This would not hamper the operation of the two-tier procedure, because the Union doesn't need to know addresses to reduce the deduction from the agency fee payers' paychecks.
 
 
 39
 Second, the Union states that such a procedure would be problematic because several school districts have in the past refused to deduct a different amount for agency fees than for agency dues. However, this refusal alone cannot satisfy the "adequate explanation" test. This is like the District refusing to follow Brown v. Board of Education, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955), because integration imposes too much of an administrative burden.
 
 
 40
 Third, the Union claims that the use of a two-tier system would require that Hudson notices be sent at least thirty days prior to the first deduction so that the identities of the objecting fee payers could be determined. Not so. While the Hudson notices would be required to determine which fee payers objected to the Union's calculation of the advance reduction, they would not be required to calculate the advance reduction and apply it to existing fee payers' paychecks. Operating the two-tier procedure would require only that Hudson notices be sent out at the same time they are now.
 
 
 41
 Fourth, the Union states that the "only other option" would be to send out the notices on October 15 and delay collection of the fee until December. Again, not so. Collection of the appropriately reduced fee could begin immediately as the parties have stipulated to what the October 15 notice is to contain including the estimated chargeable and estimated nonchargeable expenditures of the Union. See Stipulation of the Parties at 3. Furthermore, the Union is already "deprived" of the agency fees for four months of each year (because the fees go straight into escrow and do not come out until rebates are paid), so the argument that a two-tier system would cause such an effect does not hold water.
 
 
 42
 In sum, the Union has not justified its failure to use such a procedure. The majority baldly asserts that "the Constitution [does not] require[ ] the school district and the Union to bear the additional administrative burden of operating a two-tier system" without citing any evidence that such a system would impose any extra burden. There are other procedures recognized and rejected by the District and the Union which would minimize the infringement on the fee payers, and no adequate reasons other than convenience to the District and the Union have been advanced for failing to use those less impinging systems.
 
 
 43
 The District's deduct-escrow-refund procedure fails to protect the fee payers' constitutional rights as identified in Hudson, and the district court's decision finding the plan constitutional should be reversed.
 
 
 
 [1]
 Nonunion teachers are called agency fee payers because they pay fees under the terms of the District's agency shop agreement. In contrast, the union teachers pay membership dues
 
 
 [2]
 In so holding we join the Second, Third, Fourth and Eleventh Circuits which have held that escrow accounts obviate the need for advance reductions. See, e.g., Gibson v. The Florida Bar, 906 F.2d 624, 631 (11th Cir.1990), cert. dismissed, --- U.S. ----, 112 S.Ct. 633, 116 L.Ed.2d 432 (1991); Crawford v. Air Line Pilots Ass'n Int'l, 870 F.2d 155, 161 (4th Cir.1989); Hohe v. Casey, 868 F.2d 69, 72 (3rd Cir.), cert. denied, 493 U.S. 848, 110 S.Ct. 144, 107 L.Ed.2d 102 (1989); Andrews v. Education Ass'n, 829 F.2d 335, 339 (2nd Cir.1987)
 The Sixth Circuit has held that unions must reduce nonmember fees in advance by at least the amount unquestionably dedicated to ideological expenses. See Damiano v. Matish, 830 F.2d 1363, 1370 (6th Cir.1987); Tierney v. City of Toledo, 824 F.2d 1497, 1503 (6th Cir.1987). As we explain in the text, we read Hudson as allowing the union more flexibility.
 
 
 [3]
 Assuming an interest rate of 10%, a non-arbitrating employee loses about 25cents of interest on the $24 put in escrow over the first three months. Because of the advance rebate, however, he gets what is essentially an interest free loan of $56 that he pays off through paycheck deductions over the next seven months. At the same interest rate, the rebate would be worth about $1.75 in advance interest, for a profit of roughly $1.50
 The employee who goes to arbitration still makes a profit, albeit a less munificent one. Assuming the arbitrator upholds the union's calculations, by sometime in mid-February the employee receives $40 with interest, which compensates him for the lost use of the money while it was in escrow. However, he also gets an advance rebate of $40 to compensate for the $8 a month that will be deducted from his paycheck over the next five months. This advance yields an economic profit of about 80cents. While these sums are too small to be of practical significance, what matters is that the procedure adopted gives the objecting employee the benefit of any imprecision in the calculation process.
 
 
 [4]
 Surprisingly, this theory is not without support in the case law. The Sixth Circuit embraced such a claim in Damiano v. Matish, 830 F.2d 1363, 1370 (6th Cir.1987), and one pre-Hudson Ninth Circuit case seems to have considered the unavailability of funds as a factor in establishing First Amendment harm. Seay v. McDonnell Douglas Corp., 427 F.2d 996, 1004 (9th Cir.1970) (dictum). For the reasons explained in the text, we decline to follow the ill-advised ruling of the Sixth Circuit. And in the two decades that the Seay dictum has been on the books, it has never been followed; its precedential effect has been dissipated by the Supreme Court's intervening ruling in Hudson. See Jerabek v. Public Employment Relations Bd., 2 Cal.App. 4th 1298, 1309, 4 Cal.Rptr.2d 181, 187 (1992) (declining to follow Seay dictum for the same reason)
 
 
 [5]
 The "adequate explanation" language in Hudson arguably relates only to the notice requirement; however, Hudson does "require[ ] that the procedure be carefully tailored to minimize the infringement" upon nonmembers' First Amendment rights. 475 U.S. at 303, 106 S.Ct. at 1074. We therefore interpret Hudson to require that the union give reasons for failing to provide an advance reduction
 
 
 [6]
 We do not address the adequacy of the notice provided by the union. See Hudson, 475 U.S. at 306-07, 106 S.Ct. at 1075-76. The district court found that the information gave plaintiffs adequate notice, Order Re Preliminary Injunction, ER at Tab 10, at 2, and plaintiffs do not challenge that finding on appeal
 
 
 [7]
 It is possible, of course, to devise a more complex system that would minimize further the burden on agency fee payers. For example, the union might operate under the assumption that those teachers who opted to be agency fee payers in one year would want to continue to be agency fee payers in the next--a plausible, but not a necessary, inference. We are hard pressed to say, however, that the Constitution requires the school district and the union to bear the additional administrative burden of operating a two-tier system (one tier for continuing employees, another for new employees and those who wish to change their status). The test, after all, is not whether the union and the school district have come up with the system that imposes the least burden on agency fee payers, regardless of cost (a test no system could possibly satisfy); rather, we inquire whether the system reasonably accommodates the legitimate interests of the union, the school district and nonmember employees
 Even the dissent concedes an escrow system is necessary as to some employees--new teachers and existing teachers who change from union status to agency fee payers. The narrow question dividing us is whether the district may extend that procedure to all employees in order to maintain a uniform classification system. The dissent disagrees with our assertion that a two-tier system would be more costly and cumbersome, but we think common experience supports our position.
 
 
 [1]
 The District and Union developed this deduct-escrow-refund procedure after trying and rejecting an advance reduction of dues system, and considering and rejecting a system using an October 15 notice and delay in collection of the fee until the end of December. See Stipulation of the Parties at 16-17
 The advance reduction system was dropped as unworkable because several school districts refused to deduct a different amount for agency fees than for member dues, and, further, the reduced fee would require Hudson notices at least thirty days prior to the first deduction so that the identity of the objecting fee payers could be identified. Id. at 17.
 The delayed collection option was not adopted because it would deprive the unions and affiliated locals of any agency fees for four months each year and, in addition, fee payers would have to pay a much larger amount each month for the rest of the school year to recoup amounts owed for the four months when deduction did not take place. The Union was concerned that this unequal deduction (compared with union members fees deducted over ten months) might raise equal protection claims. Id. at 17-18.