Christine A. CUMMINGS,
et al., Plaintiffs,

v.

Kathleen CONNELL, Controller, State
of California, et al., Defendants.

No. CIV.S–99–2176 WBSDAD.

United States District Court,
E.D. California.

May 2, 2001.

Order Amending Judgment on Denial
of Reconsideration July 31, 2000.

W. James Young, National Right to Work Legal, Defense Foundation Inc, Springfield, VA, Dylan Bradley Carp, Kirkpatrick and Lockhart LLP, San Francisco, CA, for Plaintiffs.

Warren Curtis Stracener, California Department of Personnel Administration, Legal Division, Sacramento, CA, Christopher C. Foley, Attorney General's Office of the State of California, Los Angeles, CA, Leslie R. Lopez, Attorney General's Office of the State of California, Harry J. Gibbons, Jr., Anne Maria Giese, California State Employees Association, Sacramento, CA, Jeffrey Brian Demain, Altshuler Berzon Nussbaum Rubin and Demain, San Francisco, CA, for Defendants.

## MEMORANDUM AND ORDER

SHUBB, District Judge.

Named plaintiffs represent a class of state employees organized in bargaining units represented by defendant California State Employees Association, Local 1000 ("CSEA" or "the union"). Plaintiffs, who are not union members, allege that CSEA has been improperly withholding a portion of union dues from their paychecks without providing them with the procedural safeguards mandated by *Chicago Teachers Union v. Hudson*, 475 U.S. 292, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986). In addition, plaintiffs claim that the indemnification provision contained in the collective bargaining agreement between the union and the State of California is void as against public policy. Both plaintiffs and defendants move for summary judgment pursuant to Federal Rule of Civil Procedure 56.

### I. *Procedural and Factual Background*

CSEA is the exclusive representative for collective bargaining purposes of all employees in bargaining units 1, 3, 4, 11, 14, 15, 17, 20, and 21. In March 1999, defendants Morgenstern and CSEA entered into collective bargaining agreements allowing the state employer to deduct and forward "fair share" fees from plaintiffs' ("fee payers" or "nonmembers") paychecks to CSEA. The "fair share" purportedly represents the nonmember's share of the cost of collective bargaining. In April and June 1999, CSEA sent two notices to nonmembers regarding the "fair share" deductions ("April notice" and "June notice"). The June notice included the "1998 Expenditure Report," which was based on an independent audit (the "Audit") of CSEA's 1998 financial records prepared by the Gibson and Company, Inc., a certified public accounting firm.

■ Plaintiffs filed their complaint and moved for a preliminary injunction in November 1999, claiming that the April and June notices were constitutionally inadequate under *Chicago Teachers Union v. Hudson*, 475 U.S. 292, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986), because defendants did not provide an actual copy of the Audit with the notices. On December 20, 1999, this court certified the class and partially granted plaintiffs' motion.[1] Specifically,

---

1. The court certified the following class:
 All former, current, and future State of California employees employed in Bargaining Units 1, 3, 4, 11, 14, 15, 17, 20, and 21 who are, have been, or will be represented exclusively for purposes of collective bargaining by CSEA, but who are not, were not, or will not be members of CSEA, and were (after 2 March 1999), are, and/or will be nevertheless required to pay agency fees to CSEA as a condition of continued State employment.

this court ordered that upon the posting of a security bond, "defendants ... shall be enjoined from seizing agency fees from plaintiffs or any member of the represented class until defendants have provided such plaintiff or member of the class with a copy of the auditor's report and the appropriate documentation." (Memorandum and Order filed Dec. 20, 1999, at 24:8–16).[2]

In January 2000, defendants mailed a copy of the Audit to plaintiffs. On January 19, 2000, plaintiffs moved for a temporary restraining order ("TRO"), claiming, among other things, that defendants did not change the deadline for plaintiffs to object to the notice after sending them the Audit. The court denied the motion for TRO in open court "on the condition that ... defendants shall provide to the class members an adequate notice again making reference to the audits that are now being distributed, and allowing the plaintiffs and the members of the class an opportunity to challenge the audits pursuant to the discussion in *Chicago Teachers Union v. Hudson.*" (Transcript of Jan. 19, 2000 TRO hearing, at 28:13–20).

On January 25, 2000, the Controller's Office mailed the "January 2000 Amended Notice" (the "amended notice") to the fee payers. Among other things, the amended notice referenced the Audit and extended the period for nonunion members to challenge the fee calculation until March 1, 2000. The court heard plaintiffs' January 19 motion as a preliminary injunction on February 23, 2000, and denied the motion.

In May, CSEA mailed the "May 2000 Notice To Fee Payers" ("May notice"). This notice included an "allocation audit," which verifies a union's allocation of chargeable and non-chargeable expenses, and integrated the prior notices and the "1998 Expenditure Report." Plaintiffs agreed during oral argument that the May notice met the requirements of *Hudson.* The May notice allowed fee payers to retroactively object to all prior deductions, beginning with the first deduction in April 1999. According to defendants, by the end of March 2001, all objectors will have received a refund of the entire non-chargeable portion of the 1999 "fair share" fee, with interest.

Plaintiffs move for summary judgment on the adequacy of the April, June and January notices, as well as the validity of the indemnification provision contained in the collective bargaining agreements between the State of California and CSEA. Defendants move for summary judgment on the grounds that (1) the June and January notices are adequate as a matter of law; (2) plaintiffs have not suffered any compensable harm; (3) if plaintiffs have suffered compensable harm, their challenges to CSEA's expenditures have no merit; (4) plaintiffs do not have standing to challenge the indemnification provision; and (5) the indemnification provision is valid as a matter of law.[3]

## II. *Discussion*

The court must grant summary judgment to a moving party "if the pleadings,

---

(Memorandum and Order filed Dec. 20, 1999, at 23:23–27).

**2.** Agency fees are synonymous with "fair share" fees, which represent a nonmember's pro rata share of expenses incurred by the union in negotiating collective bargaining agreements. *See Leer v. Washington Educ. Ass'n,* 172 F.R.D. 439, 443 (W.D.Wash.1997).

**3.** In addition, defendants Connell and Morgenstern move for summary judgment on the ground that the State employer has no duty to review "Hudson" notices prepared by CSEA. The court does not reach the merits of this issue because the court's award of partial restitution leaves no injury that is redressable against defendants Connell and Morgenstern.

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The party adverse to a motion for summary judgment may not simply deny generally the pleadings of the movant; the adverse party must designate "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Simply put, "a summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data." *Taylor v. List,* 880 F.2d 1040, 1045 (9th Cir.1989). The non-moving party must show more than a mere "metaphysical doubt" as to the material facts. *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### A. *Adequacy of Notices Mailed by CSEA*

■ Nonunion public employees can be compelled to pay their *pro rata* share of the costs of collective bargaining, contract administration, and grievance adjustment. *See Hudson,* 475 U.S. at 294, 106 S.Ct. 1066. However, public employees cannot be compelled to support ideological causes that they oppose. *See Abood v. Detroit Bd. of Educ.,* 431 U.S. 209, 235, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977) "[T]he Constitution requires that such expenditures be financed from charges, dues or assessments paid by employees who do not object to advancing those ideas . . . ." *Id.* at 235–36, 97 S.Ct. 1782.

■ In *Hudson,* the Supreme Court considered the procedural safeguards necessary to protect nonmembers' First Amendment rights. *Hudson,* 475 U.S. at 302, 106 S.Ct. 1066. "The objective must be to devise a way of preventing compulsory subsidization of ideological activity by employees who object thereto without restricting [a union's] ability to require every employee to contribute to the cost of collective-bargaining activities." *Id.* According to the Court, the minimal procedural requirements for deducting union fees from nonmembers paychecks include "an adequate explanation of the basis for the fee, a reasonably prompt opportunity to challenge the amount of the fee before an impartial decisionmaker, and an escrow for the amounts reasonably in dispute while such challenges are pending." *Id.* at 310, 106 S.Ct. 1066. To comply with *Hudson,* unions generally send a *"Hudson* notice" to nonmembers.

#### 1. *Adequacy of the April and June Notices*

■ The April and June notices were not adequate under *Hudson* because they did not adequately explain the basis for the fee. Specifically, the union failed to provide a copy of the Audit in the absence of a fee payer's formal request. Accordingly, plaintiffs are entitled to summary judgment with respect to these two notices.

■ *Hudson* requires that unions provide "adequate" or "sufficient" financial disclosure so that nonmember employees may "gauge the propriety of the union's fee." *Hudson,* 475 U.S. at 306, 106 S.Ct. 1066. The union must provide nonmembers an "adequate explanation of the basis for the fee." *Id.* at 310, 106 S.Ct. 1066. "The union need not provide non-members with an exhaustive and detailed list of all its expenditures, but adequate disclosure surely would include the major categories of expenses, as well as verification by an independent auditor." *Id.* at 307 n. 18, 106 S.Ct. 1066.

The Ninth Circuit has held that an adequate explanation of the basis of the fee includes an audit verifying that the union "actually spent the amounts of money it claimed to have spent on the chargeable activities." *See Knight v. Kenai Peninsula Borough Sch. Dist.,* 131 F.3d 807, 813 (9th Cir.1997); *see also Prescott v. El Dorado County,* 177 F.3d 1102, 1107–08 (9th Cir.1999) ("real independent verification of the financial data in question" required under *Hudson* ), vacated in part and remanded, 528 U.S. 1111, 120 S.Ct. 929, 145 L.Ed.2d 807 (2000), reinstated in part and remanded, 204 F.3d 984 (9th Cir.2000).

The Ninth Circuit has not explicitly addressed whether an auditor's report must be provided to nonmembers without a formal request.[4] The Sixth Circuit, however, has addressed this issue. In *Damiano v. Matish,* 830 F.2d 1363 (6th Cir.1987), the Sixth Circuit held that:

> *Hudson* also mandates the verification of the union's calculations and disbursements from the fund by means of an independent auditor. . . . Moreover, the union must provide this information to each employee, without formal request and within a reasonable period of time, to permit the employee to evaluate the calculation of the fees in order to make a reasonable appraisal of the fees. . . .

*Id.* at 1370. The Sixth Circuit's holding serves the policy behind *Hudson,* which is to ensure that nonmembers are provided with sufficient information so that they can verify the expenditures without the burden of making a formal request.

The April notice did not serve the policy behind *Hudson* because it contained no financial disclosures. Although the June notice did contain the "1998 Expenditure Report," this report does not satisfy *Hudson.* The report stated:

The information in this report on the amount of CSEA's expenditures in each of these categories in 1998 is taken from the independent audit of CSEA's 1998 financial records contained in the Financial Statements prepared by Gibson and Company, Inc., a certified public accounting firm.

*(Compl.,* Ex. F). The report did not include an actual copy of the audit, but offered to send a copy of the audit upon request. *(See id.).*

Offering to send an audit upon request does not allow plaintiffs to "gauge the propriety of the union's fee," *Hudson,* 475 U.S. at 306, 106 S.Ct. 1066, nor does it tell the fee payers that the union actually spent the money the way that it claimed. *See Knight,* 131 F.3d at 813. In order to analyze the data for themselves, plaintiffs would have to either accept defendants' word that the expenditures were audited, or make a formal request for the audit. Therefore, the explanation was inadequate, and plaintiffs are entitled to summary judgment as to the April and June notices.

#### 2. *January 2000 Notices*

■■■ Plaintiffs challenge both notices mailed in January. The first notice was mailed on or about January 14, 2000, and included the Audit. It was inadequate as a matter of law because it did not provide plaintiffs with a reasonable opportunity to object. The second "amended" notice was mailed on January 25, 2000, for the purpose of extending a prior deadline to allow plaintiffs a reasonable opportunity to object to the Audit. The court finds that it was likewise inadequate under *Hudson.*

The amended notice of January 25 directed fee payers to the June notice and

---

**4.** In *Prescott,* an audit was included in the notice and thus accessibility of the audit was not an issue.

the previously mailed Audit, and stated: "These documents together explain why the [CSEA] has set the ["fair share"] fee at 88.5% of dues." (Haagensen Decl., Ex. B, Attached to CSEA's First Motion for Summary Judgment). In denying plaintiffs' second motion for preliminary injunction, this court noted:

> Although plaintiffs knew as of the date of the first hearing for preliminary injunction that defendants were only planning to send a copy of the audit to the fee payers, they did not make it clear at the time of that hearing that they thought defendants needed to send a new, complete notice with the audit.

(Memorandum and Order filed Feb. 29, 2000, at 8). Defendants have made a good faith effort, under the court's direction, to correct the apparent defects in the notices. *See id.* (recognizing that in an attempt to reach a resolution satisfactory to plaintiffs, the court itself may have led defendants into the "piecemeal" approach of correcting the apparent defects). Nevertheless, the court previously acknowledged that it was possible that plaintiffs may ultimately succeed in establishing that the "piecemeal remedial measures" were inadequate under *Hudson*. *See id.* at 7–8.

■ The First Amendment requires that the procedure for collecting fair share fees "be carefully tailored to minimize the [inherent] infringement" on nonmembers' constitutional rights. *Hudson*, 475 U.S. at 303, 106 S.Ct. 1066; *see id.* at 307 n. 20, 106 S.Ct. 1066 ("the agency shop itself is 'a significant impingement on First Amendment rights'" (quoting *Ellis*, 466 U.S. at 455, 104 S.Ct. 1883)). This requirement is satisfied in part when nonmembers are give sufficient information from which to "gauge the propriety of the union's fee." *Hudson*, 475 U.S. at 306, 106 S.Ct. 1066; *see id.* at 310, 106 S.Ct. 1066 (also requiring a reasonably prompt opportunity to challenge the amount of the fee, and an

escrow for the amounts reasonably in dispute).

The court has already concluded here that *Hudson* requires the union to provide a copy of the Audit without a formal request by plaintiffs. "The purpose of an audit is to have an independent accountant determine whether the union has actually spent the amounts of money it claimed to have spent on the chargeable activities." *Knight*, 131 F.3d at 813. This information must be provided "within a reasonable amount of time" to allow nonmembers to gauge the propriety of the fee. *Damiano*, 830 F.2d 1363, 1370.

In order to verify the union's expenditures for chargeable activities, plaintiffs must cross-reference the Audit provided in January with the "1998 Expenditure Report" included in the June notice, which identifies the chargeable and non-chargeable expenditures. The court does not conclude that the law requires that non-union members in all cases be provided a single integrated notice in order to satisfy the requirements of *Hudson*. However, the court finds that the separation of almost six months between the necessary components for explaining the basis of the fee in this case did not minimize the inherent infringement on plaintiffs' First Amendment rights. Accordingly, the amended notice, which incorporated by reference the June notice and the Audit, did not meet the requirements of *Hudson*. Therefore, plaintiffs are entitled to summary judgment as to both notices mailed in January of 2000.

### B. *Compensable Harm*

■ Defendants argue that plaintiffs have not suffered compensable harm because the deduction of union dues from nonmembers paychecks was followed by a proper *Hudson* notice in May of 2000 and

a new opportunity to object to prior deductions.

In *Grunwald v. San Bernardino City Unified School District*, 994 F.2d 1370 (9th Cir.1993), the Ninth Circuit considered whether the use of a "deduction-escrow-refund" procedure for the payment of agency fees violated the First Amendment. In that case, the union deducted full union dues from the paychecks of nonmembers and placed the fees in an escrow account. Thereafter, the union mailed a *Hudson* notice to nonmembers and allowed them to seek a rebate for the portion of dues representing expenditures that were not germane to collective bargaining. The Ninth Circuit held that such a method did not violate the First Amendment because the escrow procedure ensured that money collected from nonmembers would "not be used, even temporarily, for ideological purposes." *Id.* at 1374; *see also Hudson*, 475 U.S. at 305–307, 106 S.Ct. 1066. Further, the court emphasized that the union reasonably accommodated the nonmembers' First Amendment interests by providing adequate notice as soon as practicable, and a prompt refund. *Grunwald*, 994 F.2d at 1375–76; *see also Knight*, 131 F.3d at 812 ("as soon as practicable, the union must send out proper notices").

This case is materially different from *Grunwald*. Here, defendants began deducting fees from plaintiffs' paychecks in April 1999. However, defendants did not reduce the fees in advance to reflect only those expenditures that are germane to collective bargaining.[5] Nor have defendants demonstrated that nonmembers' fees were never used, even temporarily, for ideological purposes. The court finds no support in the record to conclude, consistent with *Grunwald*, that plaintiffs' fees

(both objectors and non-objectors) were placed in escrow beginning with the initial deductions in April 1999. Further, plaintiffs did not receive adequate notice under *Hudson* until May of 2000, almost thirteen months after the initial deduction.

In contrast, the plaintiffs in *Grunwald* received adequate notice no later than fifteen days after the initial deduction. Although the May notice is retroactive, the court cannot conclude, as a matter of law, that the May notice constitutes a reasonable accommodation of plaintiffs' First Amendment right to a "fair, prompt and effective procedure." *Grunwald*, 994 F.2d at 1373; *see also Ellis*, 466 U.S. at 440–41, 104 S.Ct. 1883 ("By exacting and using full dues, then refunding months later the [non-chargeable] portion, the union effectively obtains an involuntary loan for purposes to which the employee objects."); *Knight*, 131 F.3d at 812 (stating that "as soon as practicable, union must send out proper notices"). Therefore, defendants have not demonstrated that plaintiffs have suffered no compensable harm. *See Knight*, 131 at 812 (finding that union's refund of monies received is relevant to amount of damages, but does not moot claims under *Hudson* ).

### C. *Appropriate Relief*

Plaintiffs argue that all non-union members, both objectors and non-objectors, are entitled to full restitution of deductions made prior to May 2000. In the alternative, plaintiffs request that the court "adjudicate the appropriately chargeable fee," and award restitution of the non-chargeable deductions. The court treats plaintiffs' alternative request as a challenge to the propriety of the "fair share" fee calculated in the May notice. The court consid-

---

**5.** The fees paid by nonmembers were reduced only to exclude expenditures relating to member-only benefits, such as group insurance plans and entertainment discounts. The fees were not reduced in advance to exclude expenditures such as charitable donations and legislative advocacy.

ers first whether plaintiffs are entitled to full or partial restitution, and second, because defendants have raised the issue on summary judgment, whether there are any triable issues with respect to CSEA's determination of the chargeable "fair share" fee.

### 1. Refund of Non–Chargeable Portion of the Fee

■ Under *Prescott*, plaintiffs are not entitled to full restitution of the deducted fees. *See Prescott*, 177 F.3d at 1109 (finding that "demand for full restitution was punitive insofar as it sought to deprive the union of fees to which it was, doubtlessly, entitled"). However, plaintiffs may recover the portion of the fees collected for expenditures that are not "germane" to the union's collective-bargaining activity. *See Abood*, 431 U.S. at 238, 97 S.Ct. 1782 (discussing restitution as an appropriate remedy); *see also Lehnert v. Ferris Faculty Ass'n*, 500 U.S. 507, 519, 111 S.Ct. 1950, 114 L.Ed.2d 572 (1991) ("chargeable activities must . . . be 'germane' to collective-bargaining").

■ In awarding partial restitution, the court is not presuming dissent by all nonmembers. *See Abood*, 431 U.S. at 238, 97 S.Ct. 1782 ("dissent is not to be presumed") (quoting *International Ass'n of Machinists v. Street*, 367 U.S. 740, 776, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961)). Rather, the court finds that plaintiffs had no burden to object where, as here, deductions were made in the absence of a reasonably prompt notice that satisfied the requirements of *Hudson*. *See Hudson*, 475 U.S. at 309, 106 S.Ct. 1066 (finding certain requirements necessary to minimize both the impingement on nonmembers' First Amendment interests and their burden of objection); *Air Line Pilots v.*

*Miller*, 523 U.S. 866, 878, 118 S.Ct. 1761, 140 L.Ed.2d 1070 (1998) ("The very purpose of Hudson's notice requirement is to provide employees sufficient information to enable them to identify the expenditures that, in their view, the union has improperly classified as germane."). Therefore, the court concludes that all class-members, not just those who objected to non-germane expenditures pursuant to the May notice, are entitled to a refund of the non-chargeable portion of their "fair share" fee payments for the 1999 fee payer year.[6]

### 2. Chargeable Expenditures

■ Plaintiffs contend that "all of CSEA's expenditures are legally non-chargeable," and defendants have the burden of demonstrating "from contemporaneous hard data" that all the activities charged to fee payers were germane to collective bargaining. (Opp'n at 55:18–20, 56:18–22, 57).

In *Air Line Pilots v. Miller*, 523 U.S. 866, 118 S.Ct. 1761, 140 L.Ed.2d 1070 (1998), the Supreme Court recognized that while "the nonunion employee has the burden of raising an objection, . . . the union retains the burden of proof." *Miller*, 523 U.S. at 877, 118 S.Ct. 1761 (quoting *Hudson*, 475 U.S. at 306, 106 S.Ct. 1066). However, a plaintiff who is challenging the calculation of an agency fee cannot "file a generally-phrased complaint, then sit back and require the union to prove the 'germaneness' of its expenditures without a clue as to 'which of its thousands of expenditures' the objectors oppose." *Miller*, 523 U.S. at 878, 118 S.Ct. 1761. In federal court, "agency-fee challengers, like all other civil litigants, must make their objections known with the degree of specificity appropriate at each stage of litigation . . . ." *Id.*

---

**6.** Defendants claim that by the end of March 2001, all objectors received a refund of the entire non-chargeable portion of the 1999 "fair share" fee, with interest, according to the fee calculation provided in the May notice.

Pursuant to *Miller*, plaintiffs must "point to the expenditures or classes of expenditures [they] find questionable" with the degree of specificity appropriate on summary judgment. *Miller*, 523 U.S. at 878, 118 S.Ct. 1761. Plaintiffs claim that CSEA "Board of Directors" meetings, and "other meetings regarding association governance," were not 100% chargeable because those meetings involved activities of a political nature. (Pls.' Opp'n at 57:10–13); (Defs.'s Ex. B at 14:3–7, Attached to Gibbons Decl.). Plaintiffs further claim that a CSEA employee, Cathy Hackett, improperly recorded a non-chargeable activity as chargeable to fee payers on her time sheet. (Pls.' Opp'n at 57:4–9). Plaintiffs have not pointed to any other expenditures that they claim were improperly charged.[7]

Defendants argue that the expenditures challenged by plaintiffs are chargeable as a matter of law. In *Lehnert*, the Supreme Court held that "chargeable activities must (1) be 'germane' to collective-bargaining activity; (2) be justified by the government's vital policy interest in labor peace and avoiding 'free riders'; and (3) not significantly add to the burdening of free speech that is inherent in the allowance of an agency or union shop." *Lehnert*, 500 U.S. at 519, 111 S.Ct. 1950. The Supreme Court has recognized that the test for determining whether expenditures are germane to collective bargaining, and thus chargeable to nonmembers, is "whether the challenged expenditures are necessarily or reasonably incurred for the purpose of performing the duties of an exclusive representative of the employees in dealing with the employer on labor-management

issues." *Ellis*, 466 U.S. at 448, 104 S.Ct. 1883; *see also Lehnert*, 500 U.S. at 523, 111 S.Ct. 1950 (extending the reasoning of *Ellis* to public-sector unions). The Court has "never interpreted that test to require a direct relationship between the expense at issue and some tangible benefit to the [nonmembers'] bargaining unit." *Lehnert*, 500 U.S. at 522, 111 S.Ct. 1950.

In *Ellis*, the Supreme Court considered whether certain expenditures were germane to collective bargaining. *See* 466 U.S. at 448–455, 104 S.Ct. 1883 (considering expenses related to national union conventions, social activities, publications, and *organizing efforts outside the bargaining unit*). The Court had "very little trouble in holding that [nonmembers] must help defray the costs of [national] conventions." *Id.* at 448, 104 S.Ct. 1883. The Court concluded that such events were chargeable despite the fact that the convention activities included major addresses by prominent politicians. *But see id.* at 459, 104 S.Ct. 1883 (Powell, J., dissenting) (suggesting that the union should be required to make "reasonable estimates" of expenses fairly attributable to political activities and make "appropriate deductions from the dues of objecting employees").

According to the Court in *Ellis*, "if a union is to perform its statutory function [as an exclusive bargaining representative], it must maintain its corporate or associational existence, must elect officers to manage and carry on its affairs, and may consult its members about overall bargaining goals and policy." *Id.* at 448, 104 S.Ct. 1883. The Court emphasized that unions must have a "certain flexibility" in their use of compelled funds. *Id.* at

---

7. Plaintiffs have previously challenged expenditures relating to the organizing costs of an affiliate union, the "Service Employees International Union" ("SEIU"). However, defendants note that the May notice categorized SEIU organizing expenditures as non-charge-able and accordingly lowered the chargeable fee. Thus, CSEA's calculation of the "fair-share" fee does not include SEIU organizing expenditures, and plaintiff's challenge to this expenditure is accordingly moot.

456, 104 S.Ct. 1883. (stating that expenses related to union conventions and publications are "well within the acceptable range" of costs reasonably incurred for collective bargaining purposes). Further, the Court found that because the costs associated with conventions "relate to the work of the union in the realm of collective bargaining," such expenses are justified by the governmental interest in overcoming the free-rider problem. *Id.* Allowing such expenses imposes "little additional infringement on First Amendment rights beyond that already accepted" in the nature of the agency shop itself. *Id.*

Like conventions, board meetings "are a standard feature of union operations." *Id.* at 450, 104 S.Ct. 1883; *see also Abood,* 431 U.S. at 223, 97 S.Ct. 1782 ("The furtherance of the common cause leaves some leeway for the leadership of the group.") (quoting *Machinists v. Street,* 367 U.S. at 776, 778, 81 S.Ct. 1784 (1961)). The Court in *Ellis* did not hold that unions must allocate time spent during such meetings for germane and non-germane activities. Requiring a union to apportion time spent during board meetings would remove the flexibility necessary for the union's performance of its function as an exclusive collective bargaining representative. *See Fell v. Independent Association of Continental Pilots,* 26 F.Supp.2d 1272, 1280–81 (D.Colo.1998) (finding that "the expenses surrounding the Board of Director's meetings are germane."). Therefore, the court finds that costs associated with board meetings, and other meetings related to the governance of the union as a collective bargaining representative, are germane and chargeable as a matter of law.

Plaintiffs also claim that a CSEA employee, Cathy Hackett, improperly recorded "organizing campaign" activity as chargeable to fee payers on her time sheet. In *Ellis,* the Court held that organizing expenses associated with the recruitment of employees outside the bargaining unit are not chargeable because such costs are not justified by the governmental interest in overcoming the free-rider problem. *See Ellis,* 466 U.S. at 452, 104 S.Ct. 1883. Here, defendants have offered uncontroverted evidence that the notation, "organizing campaign," referred to a "contract campaign" in which Cathy Hackett organized existing bargaining unit members to discuss contract proposals and generate support among unit members for CSEA's position at the bargaining table. (*See* Hackett Decl. ¶¶ 4–5) ("Among other things, the campaign publicized CSEA's bargaining proposals, organized rallies in support of CSEA's bargaining teams, and conducted worksite meetings at which the progress of negotiations and related matters were discussed."). Unlike in *Ellis,* the costs associated with Cathy Hackett's organizing activity were necessarily and reasonably incurred for CSEA's purpose of performing its duties as a collective bargaining representative. Plaintiffs have not offered any evidence to dispute defendants' showing. Therefore, the expenditures are germane and thus, chargeable to fee-payers.

In sum, defendants are entitled to summary judgment on plaintiffs' challenge to the propriety of the "fair share" fee. The court will accordingly award partial restitution based on CSEA's calculation of the non-chargeable portion of the "fair share" fee. Pursuant to the May notice, CSEA's calculation of non-germane expenditures is twenty-seven percent of regular membership dues at the fee-payer's salary level for the 1999 fee-payer year.[8] (*See* Defs.' Ex.

---

**8.** Plaintiff has filed an evidentiary objection to defendants' Exhibit A, attached to the declaration of Patrick Haagensen in support of CSEA's Second Motion for Summary Judg-

C, Attached to Harrigan Decl. in Support of CSEA's First Motion for Summary Judgment, filed July 6, 2000). Plaintiffs who did not object under the May notice paid ninety-three percent of regular membership dues as their "fair share" fee. *See id.* Thus, the appropriate restitution for those plaintiffs who have not yet received a refund is twenty percent of regular membership dues at the fee-payer's salary level.

### 3. *Permanent Injunctive Relief*

In their prayer for relief, plaintiffs seek a "permanent injunction prohibiting [d]efendants from taking any action to demand or collect from plaintiffs and class members, by any means, so-called 'fair share fees,' and from taking any other action to enforce the 'fair share fee' provisions of the State/CSEA memoranda of understanding, ... until a constitutional agency fee seizure approved by this Court is established and operating." (Compl. at 14:14–18). Plaintiffs agreed during oral argument that the May notice, provided for the 1999 fee payer-year, satisfied the requirements of *Hudson.* It is further undisputed that defendants mailed a Hudson notice for the 2000 fee payer-year consistent with the satisfactory format of the May notice. Accordingly, a constitutional agency-fee collection procedure is established and operating, and injunctive relief is no longer warranted.

### C. *Validity of Indemnification Provisions*

Plaintiffs argue that the collective bargaining agreements contain an indemnification provision that is "void as against public policy" because the provision creates disincentives for defendants' protection of plaintiffs' constitutional rights.[9] Defendants argue that plaintiffs do not have standing to contest the provisions and further, that the provisions do not violate public policy.

In *Prescott v. County of El Dorado,* 177 F.3d 1102 (9th Cir.1999), the Ninth Circuit affirmed the district court's holding that a public employee lacked standing to challenge an indemnification provision in a collective bargaining agreement between a labor union and a public employer. The Supreme Court vacated and remanded the Ninth Circuit's decision for consideration in light of *Friends of the Earth v. Laidlaw Environmental Servs.,* 528 U.S. 167, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000).[10]

In *Prescott,* the Ninth Circuit acknowledged that the plaintiffs suffered some injury when fees were deducted from their paychecks, but concluded that the plaintiffs could not demonstrate that the injury was fairly traceable to the indemnification

---

ment. Exhibit A appears to be a copy of the Supplemental Award and Opinion issued in arbitration proceedings which took place during June and August 2000. The court has not made any reference to Exhibit A in making its determination, and thus need not rule on the document's admissibility.

9. Each agreement contains the following indemnification provision:

The Union agrees to indemnify, defend, and hold the State and its agents harmless against any claims made of any nature and against any suit instituted against the State arising from ... payroll deductions ....

(Pls.' Ex. A(1), Art. 4, sec. 3.2(b), Attached to Plaintiffs' Statement of Undisputed Material Facts).

10. The Ninth Circuit then vacated and remanded the district court's standing determination. *See Prescott,* 204 F.3d 984 (reinstating its prior decision in part). In an order filed April 17, 2001, Judge Karlton granted defendants' motion for summary judgment, finding that plaintiffs did not have standing to challenge the indemnification provision. *Prescott v. County of El Dorado,* 915 F.Supp. 1080 (1996).

provision. *See Prescott*, 177 F.3d at 1112. The court characterized the plaintiffs' claim that "the provision will somehow cause the [public employer] to ignore its own duties" as "rank speculation." The court finds nothing in *Laidlaw* that alters this conclusion.[11]

Plaintiffs offer no evidence of defendants' motivation with respect to the indemnification clause. Instead, plaintiffs contend that "the principle of res ipsa loquitur would seem to apply to [indemnification] clauses which appear only within forced-unionism provisions" of collective bargaining agreements. However, the existence of the provision alone cannot satisfy plaintiffs' burden to show that their alleged harm is fairly traceable to the indemnification provision. *See Lujan*, 504 U.S. at 561, 112 S.Ct. 2130 ("The party invoking federal jurisdiction bears the burden of establishing these [standing] elements.").

Further, the Ninth Circuit held that the plaintiffs' claim that their injury would be redressed by a favorable decision striking the indemnification provision was also based on pure speculation. *Id.* ("[I]t can hardly be said that our striking down of the provision would lead to some irenic world wherein all fee deduction procedures were properly followed because someone would finally have an incentive to assure that they were."). *Laidlaw* appears to alter this analysis only by adding the principle that a remedy affords redress for the threat of continuing violations when it "encourage[s] defendants to discontinue current violations and deter[s] them from committing future ones." *Laidlaw*, 528 U.S. at 186, 120 S.Ct. 693. The Supreme

Court acknowledged, however, that "there may be a point at which the deterrent effect of a [remedy] becomes so insubstantial or so remote that it cannot support ... standing." *Id.*

Plaintiffs argue that "the threat of future violations would be redressed by entry of prospective declaratory and injunctive relief prohibiting" enforcement of the indemnification clause, and "thus forcing [defendant] Connell to execute her duties absent the umbrella of indemnification provided by the clause." (Opp'n at 25:1–3). In order to prevail on this argument, plaintiffs must first demonstrate that the threat of future violations is an injury that is "actual or imminent, not conjectural or hypothetical." *Laidlaw*, 528 U.S. at 180–81, 120 S.Ct. 693.

In *Los Angeles v. Lyons*, 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983), the Supreme Court denied standing on the ground that the plaintiff could not credibly allege that he faced a realistic threat of future harm. *Lyons*, 461 U.S. at 108, 103 S.Ct. 1660. In *Lyons*, the plaintiff sought to enjoin the use of police chokeholds because "he feared he would be choked in any future encounter with the police." *Id.* at 107, n. 8, 103 S.Ct. 1660. Like in *Lyons*, plaintiffs' alleged injury is based on their fear that defendants will commit future violations as a result of the indemnification clause. Under *Lyons*, "[i]t is the reality of the threat of repeated injury that is relevant to the standing inquiry, not the plaintiff's subjective apprehensions." *Id.* "The reasonableness of [plaintiffs'] fear is dependent upon the likelihood of a recur-

---

11. The Supreme Court alluded to the causal inquiry when it concluded that it saw "nothing improbable" about the proposition that the defendants' alleged discharge of illegal pollutants into a river caused the plaintiffs' to curtail their recreational use of the waterway. However, the Court made this determination in the context of whether the plaintiffs' suffered an injury in fact that was not conjectural or hypothetical. Accordingly, this court does not interpret *Laidlaw* to create a "nothing improbable" standard for determining whether a plaintiff's injury is fairly traceable to the challenged conduct.

rence of the allegedly unlawful conduct." *Id.*

Plaintiffs have not only failed to establish any previous injury that was traceable to the indemnification provision, but they have also failed to show that defendants' allegedly unlawful conduct, i.e. the deduction of fees without an adequate explanation for the basis of the fee, will likely recur. The court will not presume that defendants will act unlawfully in the future. *See O'Shea,* 414 U.S. at 497, 94 S.Ct. 669 (declining to assume that unlawful conduct will occur as a condition to finding a real and immediate threat of harm). Plaintiffs' anticipation of future harm is not "sufficiently real and immediate" to establish an injury that is imminent, as opposed hypothetical. Therefore, plaintiffs cannot show an injury in fact based on the threat of future harm.

 Even if plaintiffs could establish imminent harm as a result of the indemnification provision, plaintiffs cannot show that injunctive relief would redress their injury. In order to find that prospective relief would deter such harm, the court must accept the unreasonable premise that the provision's existence somehow encourages defendants to disregard their duties. In the absence of any evidence of defendants' motivation with respect to the indemnification provision, the existence of a deterrent effect is no more than "rank speculation." Therefore, plaintiffs have failed to establish the elements of standing, and defendants are entitled to summary judgment on this claim.

IT IS THEREFORE ORDERED that plaintiffs' motion for summary judgment be, and the same hereby is, GRANTED with respect to the April, June, and January notices. IT IS FURTHER ORDERED that defendants' motions regarding the propriety of the "fair share" fee, and plaintiffs' standing to challenge the indemnification provision be, and the same hereby are, GRANTED. Defendant CSEA shall return to all plaintiffs who paid "fair share" fees for the 1999 fee-payer year, and who have not yet received an equivalent refund, twenty percent of regular membership dues at the fee-payer's salary level for the 1999 fee-payer year, with interest.[12] All other relief prayed for in the complaint is denied.

IT IS SO ORDERED.

### *MEMORANDUM AND ORDER RE MOTION TO RECONSIDER OR AMEND JUDGMENT*

Defendant California State Employees Association, Local 1000 ("CSEA") seeks relief from the judgment entered on this court's order of May 2, 2001 granting plaintiffs' motion for summary judgment in part and awarding partial restitution of withdrawn fees, pursuant to Federal Rule of Civil Procedure 60(b), or in the alternative, alteration or amendment of the judgment pursuant to Rule 59(e).

In its May 2, 2001 order, the court awarded restitution of the non-chargeable portion of the withdrawn fees to all non-members, including those who did not object pursuant to the May 2000 notice. CSEA's present motion is based on the ground that an "intervening" Ninth Circuit decision, decided after this court's decision filed May 2, "makes clear that the remedy should only run to those fee payers who filed objections in response to CSEA's May 2000 Notice." (Def. CSEA's Notice of Motion and Motion for Relief from Judgment, filed June 11, 2001, at 2:6–8).

In the alternative, CSEA moves to alter or amend the judgment, on the ground

---

**12.** *See supra,* at 1072–73 (explaining that this figure is based on CSEA's calculation of the non-chargeable portion of the "fair share" fee under the May notice).

that CSEA should not be required to refund fees collected after the nonmembers received the May notice, which plaintiffs agree was adequate under *Chicago Teachers Union v. Hudson,* 475 U.S. 292, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986). CSEA also argues that the award does not account for CSEA's mid-year fee adjustment, which reduced the non-chargeable portion of the fee.

### *Discussion*

### A. *Motion for Relief from Judgment*

Preliminarily, plaintiffs urge this court not to consider the merits of CSEA's arguments on this motion, citing Ninth Circuit authority for the proposition that an alleged change in judicial view of applicable law after final judgment is not a sufficient basis for vacating such judgment entered before announcement of the change. *See Title v. United States,* 263 F.2d 28, 31 (9th Cir.1959); *see also Perrin v. Aluminum Co. of America,* 197 F.2d 254, 255 (9th Cir.1952) ("Rule 60(b) was not intended to be resorted to as an alternative to review by appeal[.]").

CSEA, on the other hand, argues that both its Rule 59(e) and 60(b) motions are timely, citing Local Rule 78–230(k). *See also School Dist. No. 1J, Multnomah County, Or. v. ACandS, Inc.,* 5 F.3d 1255, 1262–63 (9th Cir.1993); *United States v. Westlands Water Dist.,* 134 F.Supp.2d 1111, 1130 (E.D.Cal.2001). Both sides agree that an appeal will be taken from this court's judgment, regardless of how the court rules on the pending motion, and that the Court of Appeals will ultimately have to deal with any cases decided after this court's judgment became final. Therefore, in order to provide the appellate court with the a complete record, the court resolves this threshold conflict in favor of addressing CSEA's arguments on their merits.

 CSEA argues that the Ninth Circuit's recent decision in *United Food and Commercial Workers Union, Local 1036 v. National Labor Relations Bd.,* 249 F.3d 1115 (9th Cir.2001), requires that this court grant CSEA relief from the court's order awarding a partial refund to nonmembers who did not object pursuant to the May notice.[1] In *Local 1036,* the Ninth Circuit considered whether the union violated a provision of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(b)(1)(A), "by informing new employees [in a 'welcome letter'] that they were required as a condition of employment to become full members of [the local union]." *Id.* at 1117. The National Labor Relations Board (the "Board") found that the welcome letter violated the NLRA, and ordered the union to notify all bargaining unit members of their rights, and reimburse those employees who now object to being full union members. *Id.* at 1118.

The Ninth Circuit affirmed the Board's finding of a violation, but concluded that "the remedial order goes too far." *Id.* at 1120. In reaching its conclusion, the Ninth Circuit emphasized that "[t]he offending letter was not sent to all employees." *Id.* The Ninth Circuit then stated: "Reimbursement is due only those employees who received the [offending] letter and object." *Id.*

This language does not compel this court to change its order in the present case. The union's collection of fees in *Local 1036* was not subject to constitutional scrutiny because union security clauses negotiated between a union and a private employer under the NLRA "do not involve state action implicating constitutional considerations." *See California Saw and Knife*

---

1. Because all objectors have already received the refund mandated by the court's order, CSEA argues that the order should be vacated.

*Works*, 320 N.L.R.B. 224, 228 (1995), *cert. denied, Strang v. N.L.R.B.*, 525 U.S. 813, 119 S.Ct. 47, 142 L.Ed.2d 36 (1998). Thus, the union was not required to satisfy the minimal procedural requirements set forth in *Hudson*, or the collection standards expressed in *Grunwald v. San Bernardino City Unified School District*, 994 F.2d 1370 (9th Cir.1993). *See Hudson*, 475 U.S. at 304–309, 106 S.Ct. 1066 ("The Union should not be permitted to exact a service fee from nonmembers without first establishing a procedure which will avoid the risk that their funds will be used, even temporarily, to finance ideological activities unrelated to collective bargaining.") (quoting *Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 244, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977)); *Grunwald*, 994 F.2d at 1373 (requiring an adequate explanation for the use of a deduction-escrow-refund procedure, and a reasonably prompt refund).

In finding the remedy over-broad, the Ninth Circuit noted only that the offending letter was not sent to all employees. In order to accept CSEA's interpretation of *Local 1036* the court would have to infer that the Ninth Circuit would have also found the remedy over-broad if the Board did not include an objection requirement. Such an inference would be based on pure speculation and does not warrant relief from the judgment in this case.

CSEA further argues that *Local 1036* re-affirms the rule that a nonmember's "dissent is not to be presumed." *See Abood*, 431 U.S. at 238, 97 S.Ct. 1782 (quoting *International Ass'n of Machinists v. Street*, 367 U.S. 740, 776, 774, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961)). According to CSEA, this court's remedy is inconsistent with that rule because the re-fund "depends on an implicit finding that [non-objectors] would have objected to CSEA's original *Hudson* notice if only that notice had complied with *Hudson*." (Def.'s Mot. at 10:5–8). CSEA argues that such a presumption contradicts established precedent that "a union is permitted to charge the equivalent of full union dues, including the so-called 'non-chargeable' amount, to all nonmembers who do not object." (Def.'s Mot. at 10:2–4) (emphasis omitted).

■ This statement of the law is incomplete, and neglects to take into account the collection method employed by CSEA in this case. As this court noted in its May 2 order, a union is only permitted to collect full union dues when such collection complies with the minimal procedural requirements necessary to protect nonmembers' First Amendment rights. *See Hudson*, 475 U.S. at 304–309, 106 S.Ct. 1066; *Grunwald*, 994 F.2d at 1373. Although the Supreme Court has acknowledged readily available alternatives, such as an advance reduction of dues paid by nonmembers, CSEA utilized a "more cumbersome and intrusive" deduction-refund procedure by collecting fees from nonmembers for non-germane expenditures before they received adequate notice and an opportunity to object.[2] *Grunwald*, at 1375 (discussing the "deduction-*escrow*-refund" method); *see Hudson*, at 304, 106 S.Ct. 1066 (quoting *Ellis v. Railway Clerks*, 466 U.S. 435, 444, 104 S.Ct. 1883, 80 L.Ed.2d 428 (1984)); *see also Grunwald*, at 1377 ("Ideally ... the union would collect from nonmembers only that amount used for representational purposes."). In such circumstances, the Ninth Circuit has emphasized the impor-

---

**2.** CSEA's fee calculation for nonmembers discounted only those expenditures relating to member-only benefits, such as group insurance plans and entertainment discounts. The court discerns from the record that CSEA collected union fees from nonmembers without the use of an escrow procedure for eight months until this court enjoined the seizures in December of 1999.

tance of an escrow procedure, as well as a prompt notice and refund to minimize the impingement on nonmembers' First Amendment interests. *See Grunwald,* at 1374–76 (emphasizing that the use of escrow enures that money collected from nonmembers would "not be used, even temporarily, for ideological purposes"); *Knight,* 131 F.3d at 812 ("as soon as practicable, the union must send out proper notices").

In its May 2 order, this court pointed out that "[t]his case is materially different from *Grunwald.*" (Memorandum and Order, filed May 2, 2001, at 12:1); *Grunwald,* 994 F.2d at 1375–77 (holding that the deduction-escrow-refund procedure employed in that case adequately protected the plaintiffs' First Amendment rights). Here, plaintiffs did not receive adequate notice until May 2000, thirteen months after deductions began in the absence of an escrow procedure. Thus, under *Grunwald,* the May notice does not constitute a reasonable accommodation of plaintiffs' First Amendment right to a "fair, prompt and effective procedure." *Grunwald,* at 1373. Accordingly, CSEA is not entitled to retain the full union dues it collected.

The court's measure of relief is appropriate because it allows the union to retain the chargeable portion of the fees, to which it was, "doubtlessly, entitled" as plaintiffs' collective-bargaining representative. *Prescott v. County of El Dorado,* 177 F.3d 1102, 1109 (9th Cir.1999) (citing *Gilpin v. American Fed. of State, County, and Mun. Employees,* 875 F.2d 1310, 1315 (7th Cir.1989)). Because CSEA has not demonstrated circumstances warranting

relief from judgment under Rule 60(b)(6), the court must deny the motion.

### B. *Motion to Alter or Amend Judgment*

■■■ The court may alter or amend a judgment under Rule 59(e) to correct clerical errors. *See* Fed.R.Civ.P. 59(e). This court awarded a partial refund based on the non-chargeable portion of fees collected during the 1999 fee-payer year, which includes the months from April 1999 through June 1999. CSEA notes that two fee payments were collected after plaintiffs received the May notice, which was adequate under *Hudson.*[3] It is not consistent with the court's intention to include fees collected at the end of May and June in the partial refund, and the court will amend the judgment accordingly.

■■■ In the May 2 order, the court determined that the non-chargeable and thus, refundable portion of the collected fees was twenty percent of regular membership dues at the nonmember's salary level for the 1999 fee-payer year. (*See* Defs.' Ex. C, Attached to Harrigan Decl. in Support of CSEA's First Motion for Summary Judgment, filed July 6, 2000). This figure is correct for fees collected from April 1999 through December 1999.

However, in January 2000, CSEA adjusted its calculations by reducing the total fees collected from each nonmember.[4] The court's twenty-percent figure does not reflect this adjustment. Based on CSEA's calculations, the non-chargeable portion of the fees collected from January 2000 through April 2000 was fifteen and one-half percent, not twenty percent.[5] This

---

3. The May notice was mailed on May 17, and the payments were collected at the end of May and June.

4. CSEA reduced the nonmember's share of both chargeable and non-chargeable fees from ninety-three percent of full union dues, to eighty-eight and one-half percent. CSEA's

calculation of the chargeable portion did not change, remaining at seventy-three percent.

5. Fifteen and one-half percent represents the difference between seventy-three percent (chargeable portion) and eighty-eight and

calculation is consistent with the court's intention to refund only the non-chargeable portion of collected fees, and the court will amend the judgment accordingly.

IT IS THEREFORE ORDERED that defendant CSEA's motion for relief from judgment be, and the same hereby is, DENIED.

IT IS FURTHER ORDERED that defendant CSEA's motion to alter or amend the judgment be, and the same hereby is, GRANTED. The court's order filed May 2, 2001, is amended at page 25, lines 3–7, as follows: Defendant CSEA shall return to all plaintiffs who paid any "fair share" fees from April 1999 through April 2000, and who have not yet received an equivalent refund, twenty percent of regular membership dues at the fee-payer's salary level from April 1999 through December 1999, and fifteen and one-half percent of regular membership dues at the fee-payer's salary level from January 2000 through April 2000, with interest.

IT IS SO ORDERED.

one-half percent of full union dues (total fee for nonmembers).